663 F.2d 669
 Blue Sky L. Rep. P 71,681, Fed. Sec. L. Rep. P 98,335
 Louis L. HERM; Bertha M. Herm; Andrew A. Jutt; Benjamin F.
Williams; and Virginia Russ, on behalf of themselves and all
other persons other than the defendants who purchased on or
after September 11, 1968 any securities issued or sold by
Daniel Boone Fried Chicken, Inc., Plaintiffs-Appellants,
v.
Daniel W. STAFFORD; Glenn Reynolds; Phillip T. Stafford;
John L. Rollins; R. M. Pennington; Morris Burns; Leonard
Nave; European Fast Foods, Inc.; Robert T. Harrold; Great
Southern, Inc.; Albert B. Chandler, Sr.; J. Daniel Chandler;
Dale S. Coenen; Howard N. Johnson; Space Research Center,
Inc.; Jerry Lytton; Colonial Securities, Inc.; Carling
Dinkler, Jr.; Joseph L. Arnold; John W. Morgan; Albert B.
Chandler, Jr.; Whitney Dunlap; R. Haywood Alves; Murray A.
Morguelan; James R. Spence; Rogers Badgett, Jr.; and Sammy
Davis, Jr., Defendants-Appellees.
 
 Nos. 79-3002 and 79-3003.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 3, 1980.
Decided Nov. 3, 1981.
 J. Vernon Patrick, Jr. (argued), Lee H. Zell, Thomas J. Gallo, Berkowitz, Lefkovitz & Patrick, Birmingham, Ala., Spencer E. Harper, Jr., William W. Davis, Harper, Ferguson & Davis, Louisville, Ky., for plaintiffs-appellants.
 Edward A. Marye, Jr. (argued), Clay, Williamson, Rabe, Marye & Cowden, Mount Sterling, Ky., for defendants-appellees Alves, Chandler, Jr., and Dunlap.
 W. Stuart McCloy, Sr. and W. Stuart McCloy, Jr. (argued), McCloy, Dudley, Yawn & McCloy, Memphis, Tenn., Joseph R. Gathright, Jr., McCoy, Brockman & Gathright, Louisville, Ky., for defendant-appellee Rogers Badgett, Jr.
 Donald H. Balleisen (argued), Richard A. Getty, Greenebaum, Doll & McDonald, Louisville, Ky., for defendant-appellee Carling Dinkler, Jr.
 Before LIVELY, ENGEL and KEITH, Circuit Judges.
 ENGEL, Circuit Judge.
 
 
 1
 Plaintiffs, a class of persons who purchased Daniel Boone Fried Chicken (DBFC) stock after September 11, 1968[1] or received such stock in a merger with Commonwealth Security Investors (CSI), appeal from summary judgment entered against them in this securities case.
 
 
 2
 The district court granted summary judgment in favor of the defendants based on the expiration of the statute of limitations. There are three basic issues involved in this appeal. We must decide whether the district court borrowed the correct Kentucky statute of limitations for claims brought under various provisions of the federal securities laws. We must also determine if the court correctly decided that the statute had run before the defendants were named in a complaint. Also properly before us on this appeal is whether, in the alternative, the motions for summary judgment should have been granted on the merits.
 
 
 3
 The original complaint was filed on June 23, 1970. The five defendants involved in this appeal were first named in a second amended complaint filed on October 20, 1972.[2] Carling Dinkler, Jr., was allegedly a de facto or de jure director and a controlling person of DBFC. The other four defendants, Albert B. Chandler, Jr., R. Haywood Alves, Rogers Badgett, Jr., and Whitney Dunlap (the Directors) were directors of a company which merged itself into DBFC. The complaint alleged violations of the Securities Act of 1933 (1933 Act), the Securities Exchange Act of 1934 (1934 Act), the Kentucky Blue Sky statutes, and the Investment Company Act of 1940.
 
 
 4
 To analyze the appeal correctly, great care must be exercised to separate the particular facts as they relate to each defendant and the various causes of action alleged in the complaint. We describe, therefore, the posture of each party in relation to the events which later occurred.
 
 I.
 
 5
 A. DBFC, an unsuccessful fast food franchise operation, habitually overestimated its financial capabilities. Judge Hogan described the condition of DBFC in SEC v. Commonwealth Securities, Inc., No. 2161 (E.D.Ky. October 21, 1970):
 
 
 6
 After the expenditure of some $60,000 in "accounting fees," we note somewhere in this record that a bookkeeping firm, after spending nine months, still hasn't brought the postings up to date. It is pretty obvious from this record that DBFC, speaking both from a business point of view and an economic point of view and an accounting point of view, never knew whence it was coming from, where it was or where it was going. It became the subject of an insolvency receivership, as we have noted, in the Kentucky Circuit Court in July of 1970 at the tender age of two and a half years.
 
 
 7
 DBFC attempted to have name personalities associated with itself as an integral part of its marketing campaign. For example, the former governor of Kentucky and former baseball commissioner, A. B. "Happy" Chandler, Sr., became associated with the organization. DBFC sought to fill its board of directors with sports figures, known socialites and entertainment personalities.
 
 
 8
 B. Carling Dinkler, Jr., one of the defendants, is a socialite who lives and works at the Palm Bay Club in Miami, Florida. He was previously associated with the Dinkler hotel chain.
 
 
 9
 Dinkler was identified as being on the DBFC Board of Directors by a press release dated May 14, 1969:
 
 
 10
 MIAMI, FLA-Well-known hotel tycoon and socialite Carling Dinkler, Jr. announced today that he's been named to the Board of Directors of the Kentucky-based Daniel Boone Fried Chicken operation, due for nationwide introduction later this year.
 
 
 11
 In so doing, Dinkler joins forces with Hollywood star, Sammy Davis, Jr., former Kentucky governor and Senator and one-time baseball commissioner A. B. "Happy" Chandler as well as a cluster of top-ranked names from the world of sports.
 
 
 12
 Dinkler, president of the Dinkler Plaza Hotel in Atlanta, Ga., is also co-owner, with his wife Connie, of Miami's plush Palm Bay Club.
 
 
 13
 The quick service food operation, headquartered in Lexington, Ky., is barely a year old. In the past 60 days it moved into the spiraling franchise market and already more than 200 units have been sold across the country and in Mexico, according to Dinkler. Plans call for expansion into several European markets.
 
 
 14
 Locally, Dinkler said, Daniel Boone will have three outlets in the Greater Miami area, with contracts on those franchises already signed.
 
 
 15
 Presently, there are 20 company-owned Daniel Boone outlets throughout Kentucky, and although it has done no national advertising, word-of-mouth has spread its success to where it has received more franchise requests than it can now handle.
 
 
 16
 By year's end the company hopes to have the bulk of the first two hundred franchises in operation at which time it plans extensive, widespread publicity campaigns.
 
 
 17
 Others on the Board include former Boston Celtics basketball standout Frank Ramsey; Baltimore Colts running back Tom Matte; professional tennis ace, Butch Buckholz; former Miami Dolphin Rick Kessner, former Kentucky securities commissioner Daniel Stafford, president of the company, and Leonard F. Nave, Governor Chandler's law partner who serves as legal counsel for the corporation.
 
 
 18
 This press release was written by a Roger Reece, a public relations consultant in Miami. The information in the release was provided by DBFC and was not cleared in advance with Dinkler. The release grossly overstated DBFC's position in the market and its prospects for the future.
 
 
 19
 A "press conference" took place on May 14, 1969 at the Palm Bay Club.[3] Dinkler arrived at the event late and read the press release. Copies of the release were distributed to the media. In his deposition, Roger Reece identified the release as having appeared in the Miami Herald, the Florida Business Leader, the Miami News and the Miami Beach Sun. He also heard brief references to the press release on three radio shows. Pictures taken at the press conference included a staged signing at which Dinkler posed with representatives of DBFC.
 
 
 20
 Dinkler was also listed as a member of the DBFC Board of Directors in the program for a tennis tournament, called the Daniel Boone Fried Chicken Challenge Cup, held in Lexington, Kentucky on May 20, 1969. He was also named as a DBFC Board member in a press release welcoming sportscaster Frank Gifford to the DBFC Board. This particular press release was distributed to the financial news desks in a seventeen state area. Again, information for this release apparently came directly from DBFC. Finally, a movie shown to DBFC shareholders identified Dinkler as a member of the Board.
 
 
 21
 It is not clear whether Dinkler was ever actually elected to the DBFC Board of Directors.[4] It is also not clear whether Dinkler was to be compensated for his services, although there are indications in the record that some DBFC stock had been set aside for him. Counsel for DBFC stated in his deposition that he understood that Dinkler was to receive some DBFC stock when he joined the DBFC Board of Directors.
 
 
 22
 Dinkler was first deposed on April 2, 1971. He asserted he had never discussed the business affairs of DBFC, was not on the Board of Directors, had no franchise interest in DBFC, and had never seen any articles connecting him with DBFC. He also asserted that he had made no statement to the media and had not authorized the use of his name or his picture by DBFC.
 
 
 23
 Dinkler did admit that he had previously offered to give advice to his friend J. Dan Chandler in setting up a fast-food chicken business. Dinkler denied, however, that he ever saw the press release of May 14, 1969 and stated that he did not remember the meeting at the Palm Bay Club on that date. He could not recognize the individuals in the pictures taken at the time of the press conference and could not identify what he was signing in a photograph taken that day. He also asserted that he was not aware that he would be identified as a DBFC Board member in the tennis tournament program.
 
 
 24
 Dinkler was deposed again on December 13, 1974, after having witnessed the deposition of Roger Reece. He recalled having participated in the May 14, 1969 press conference and was able to remember who attended it. Dinkler recalled having "scanned" the press release, but asserted that he was unaware that DBFC had already been formed.
 
 
 25
 Dinkler again asserted that he was unaware he would be identified as a DBFC Board member in the tennis tournament program. He stated that he was not to have a function with DBFC and that he had never been promised any benefits or offered any stock. Finally, Dinkler did not recall receiving two telegrams from the DBFC directors welcoming him to the DBFC Board of Directors.
 
 
 26
 The complaint charged Dinkler with violating Section 10(b) of the 1934 Act, 15 U.S.C. § 78j and Rule 10b-5, 17 CFR 240.10b-5,[5] based on false and deceptive information contained in the press release and other misrepresentations as to his identity with DBFC. He was also charged as a "controlling person" under both Acts, 15 U.S.C. §§ 78t(a) and (b), 15 U.S.C. § 77o, by which plaintiffs seek to hold him liable for the violations of DBFC.
 
 
 27
 C. The other four defendants involved in this appeal were directors of CSI, a management, closed-end, nondiversified investment company. CSI had approximately ten or eleven directors at the relevant times. Although three of the four defendants had been active in the early direction of CSI, their role had diminished as control was acquired by outsiders.
 
 
 28
 CSI was formed as a holding company in 1965 with hopes of raising $3 million. The company was only able to raise $600,000.[6] Unable to raise additional capital, CSI sought to combine with another entity. After tentative arrangements to merge with another company began to fall through, CSI explored the merger of itself into DBFC. A directors' meeting and a special stockholders meeting was set for May 19, 1969. The explanation attached to the notice sent to CSI stockholders on May 9, 1969 provided:
 
 
 29
 The management of Commonwealth feels that it is in the best interest of the stockholders to reconsider the proposed reorganization with (the other corporation)....
 
 
 30
 Management also felt that the offer by Daniel Boone Fried Chicken Corporation to enter into a reorganization agreement with Commonwealth, whereby the shareholders of Commonwealth would receive one share of Daniel Boone Fried Chicken Corporation for each one share of Commonwealth Security Investors, Inc. owned by them, should be considered.
 
 
 31
 Management feels that the prospects for the Daniel Boone Fried Chicken Corporation are very good, and management has expressed its approval of the recision of the reorganization agreement with (the other company) and favors the adoption of the proposed reorganization with Daniel Boone Fried Chicken.
 
 
 32
 The net effect of the adoption of the proposals will be an exchange of the Commonwealth shareholders of their stock for a like amount of stock in Daniel Boone Fried Chicken Corporation. It is management's information that the current market price of Daniel Boone Fried Chicken stock is four-to-five dollars per share.
 
 
 33
 Neither the proxy nor this explanation was submitted to the SEC for approval.
 
 
 34
 A. B. "Happy" Chandler, Sr., presided at this meeting, although it is not clear whether he was still on the CSI Board. He was, however, receiving a $25,000 per year salary from DBFC. Similarly, counsel for CSI had apparently received some DBFC stock both personally and through an entity which he controlled, and J. Dan Chandler, a board member of CSI, had borrowed some money from DBFC.
 
 
 35
 The CSI directors and the stockholders approved the merger of CSI into DBFC by a unanimous vote.[7] It is not disputed that at the time of the merger CSI was a viable entity worth slightly less than $500,000.
 
 
 36
 The directors were charged with violating the Investment Company Act, 15 U.S.C. §§ 80a-1-80a-52. These claims are based on certain omissions in the proxy materials submitted to the shareholders of CSI. These alleged omissions include the failure to disclose that Chandler, Sr., an affiliated person within the meaning of the Investment Company Act, had received a salary from DBFC, the failure to disclose the affiliation of J. Dan Chandler and CSI's lawyer with DBFC in the proxy, and the failure to submit the proxy and explanation to the SEC, all in violation of Section 17 of the Investment Company Act, 15 U.S.C. § 80a-17. The plaintiffs seek to hold the directors liable as controlling persons, 15 U.S.C. § 80a-47, for CSI's failure to solicit proxies in accordance with SEC rules and regulations, 15 U.S.C. § 80a-20.
 
 
 37
 The directors are also charged with violating Section 17 of the 1933 Act, 15 U.S.C. § 77q, Section 10(b) of the 1934 Act, 15 U.S.C. § 78j, and Rule 10(b)-5, 17 CFR 240.10b-5. This is based on misleading statements in the explanation concerning the prospects of DBFC, the omissions in the proxy and explanation sent to the shareholders, the failure to have the proxy approved in advance by the SEC, and breach of their fiduciary duties by failing to make a reasonable inquiry into the financial status of DBFC prior to voting in favor of the merger.
 
 
 38
 The actions of each director in the investigation of DBFC which preceded the decision to merge are painstakingly explored in their depositions. Whitney Dunlap, now deceased, was a farmer who lived in Versailles, Kentucky, and was one of the original CSI directors. A. B. Chandler, Jr. is the son of the former governor of Kentucky. He is the publisher and majority owner of the Woodford Sun Newspaper and lives in Versailles, Kentucky. He was also one of the original CSI directors and the original president of CSI.[8] Robert Haywood Alves is the advertising manager of the Woodford Sun Times and is a partner in a clothing store. Unlike Dunlap and Chandler, Alves owned no CSI stock when he voted for the merger. The record provides little information about the fourth director, Rogers Badgett, Jr., except that he took the place of his father on the CSI Board. He was a 26 year-old student in 1969 when the CSI Board approved the merger.
 
 
 39
 The gist of the Directors' depositions is that they were anxious because there was no market for CSI stock. They were therefore quite excited about the impending merger into a company whose stock was being actively traded and which had good prospects for success. The Directors asserted that they were unaware of the affiliations of Chandler, Sr., J. Dan Chandler, and counsel for CSI with DBFC. They testified that they were not involved in approving the explanation sent to the stockholders which contained allegedly misleading statements concerning the prospects for DBFC, and did not disclose the affiliations of certain CSI figures with DBFC.
 
 
 40
 The Directors claim that they had difficulty receiving information about CSI after control was acquired by outsiders. In approving the merger, they relied upon some sort of a financial statement which DBFC had apparently furnished to them. They also received oral representations from Daniel Stafford and other DBFC directors as to the financial stability of DBFC. Another factor which influenced their decision to vote for the merger was the identification of name personalities, such as Sammy Davis, Jr., with DBFC. The Directors asserted that they were impressed by Badgett's questioning of DBFC officers which occurred during the special stockholders meeting. Each director also claimed to have had outside discussions with others concerning the prospects for DBFC. Finally, the Directors asserted that they relied on CSI counsel for showing compliance with SEC rules and regulations.
 
 II.
 
 41
 The district court granted summary judgment in favor of the five defendants involved in this appeal. It determined that the Kentucky two-year Blue Sky statute of limitations and not the five-year limitations period used for actions of general fraud applied to claims brought under the federal securities laws.
 
 
 42
 With respect to the claims brought under the Investment Company Act, the district court concluded the fraud "should upon reasonable inquiry have been discovered" and therefore that the statute of limitations started to run by May 19, 1969, when the CSI-DBFC merger was approved at the CSI special stockholders meeting. Since the second amended complaint was not filed until October 20, 1972, the action was barred by the two-year statute of limitations.
 
 
 43
 The district court determined that actions brought under Section 10 of the 1934 Act were also governed by the two-year Blue Sky statute of limitations period. The court determined that July 10, 1970 was the date by which the plaintiffs should have discovered the alleged fraud. The court based this on three events which had happened by that time. First, trading of Daniel Boone stock was suspended on July 24, 1969. Second, insolvency proceedings against DBFC were initiated in Fayette Circuit Court, Lexington, Kentucky, on June 5, 1970. Finally, the Securities Exchange Commission took action against DBFC on July 10, 1970. Although the Kentucky Blue Sky law limitations period was amended from two to three years on June 16, 1972, hence before the two-year period had elapsed, the court continued to apply the two-year period. Since the second amended complaint was filed more than two years after July 10, 1970, these claims were time barred.
 
 
 44
 Finally, with respect to the claims brought against Dinkler as a controlling person, the district court applied the one-year statute of limitations contained in Section 13 of the 1933 Act, 15 U.S.C. § 77m. These actions were likewise time barred.
 
 III.
 
 45
 The first question before us is what statute of limitations applies to the various claims brought under the federal securities acts. Many of the federal securities laws do not contain their own statute of limitations. A federal court borrows the state statute of limitations which best effectuates the purpose of the federal securities laws. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Charney v. Thomas, 372 F.2d 97 (6th Cir. 1967). There are two Kentucky statutes from which a statute of limitations may be borrowed. The first of these is the basic five-year limitations period for actions dealing with fraud. KRS 413.120. The second is the limitations period contained in the Kentucky Blue Sky laws. KRS 292.480.[9]
 
 
 46
 In Carothers v. Rice, 633 F.2d 7 (6th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1702, 68 L.Ed.2d 199 (March 24, 1981), we decided the statute of limitations contained in Kentucky's Blue Sky law and not the five-year statute of limitations contained in its general fraud statute applied to actions brought under section 10(b) of the 1934 Act and Rule 10b-5.[10] There we noted that Kentucky intended its Blue Sky law to be coordinated with the federal securities acts.[11] We stated in that case:
 
 
 47
 Neither the Kentucky common law of fraud nor the blue sky law is exactly like the rule 10b-5 action. The blue sky law has the same language and the same specific purpose; the common law of fraud has a similar defense of lack of scienter. Other courts have held that the commonality of purpose of the blue sky law weighed more than the common defense of lack of scienter of the common law action (Citations omitted).
 
 
 48
 This Court has previously said that the broad remedial purposes of the federal securities laws are best served by longer, not shorter, statute of limitations. (Citations omitted). But the reason for using the longer statute of limitations for a federal securities claim is to give the person with a federal claim at least as long an opportunity to sue as a person with a state claim. See Berry Petroleum Co. (v. Adams & Peck), supra 518 F.2d (402) at 409. The Kentucky Supreme Court has held that its blue sky law is the exclusive remedy for fraud in the sale of securities. See Owensboro (v. First U. S. Corp.), supra, 534 S.W.2d (789) at 791. The strict requirements of misrepresentation have been relaxed and the price exacted is a shortened statute of limitations. Id. A plaintiff is also relieved from proving all the elements of misrepresentation with his rule 10b-5 action; thus, it is reasonable to apply the shortened statute of limitations. Given that the language of § 292.320 is nearly identical with rule 10b-5, that both statutes have the same purpose, and that neither requires the plaintiff to prove all that is required under common law of misrepresentation, we hold that the proper statute of limitations is the three year statute of limitations in Kentucky's Blue Sky Law, § 292.480(3)....
 
 
 49
 633 F.2d at 14-15. See also Payne v. Fidelity Homes of America, Inc., 437 F.Supp. 656 (W.D.Ky.1977) (applying shorter period to claims under Section 10 of the 1934 Act and Section 17 of the 1933 Act). Thus the Kentucky Blue Sky statute of limitations will be applied to actions brought under Section 10(b) of the 1934 Act.
 
 
 50
 The highest Kentucky court has likewise held that the shorter statute of limitations contained in the Blue Sky law applies to actions brought under Section 17 of the 1933 Act:[12]
 
 
 51
 (P)laintiffs contend that the Kentucky general statutes governing actions for fraud and deceit or actions based on a statute are the applicable statutes. We disagree. It would appear again that the blue sky limitation period should apply as "the most appropriate state statute applicable" to the claim. In the first place, the provisions of 15 U.S.C.A. § 77q are almost copied verbatim in the Kentucky Blue Sky Law. See KRS 292.320. In the second place, as has been discussed, the Kentucky civil remedies section gives a purchaser oriented action for either intentional or negligent misrepresentation in the sale of securities. That is the gist of the plaintiffs' action under their federal claim.
 
 
 52
 City of Owensboro v. First U.S. Corp., 534 S.W.2d 789, 791 (Ky.1975).[13] Moreover, although Carothers v. Rice, supra, did not deal with the applicable statute of limitations for a claim brought under Section 17 of the 1933 Act, the broad language of that opinion indicates that the same statute of limitations should be adopted for such claims. 633 F.2d at 14-15. We therefore follow City of Owensboro and conclude that the shorter Kentucky Blue Sky limitations period also applies to claims brought under Section 17 of the 1933 Act.
 
 
 53
 Section 15 of the 1933 Act, 15 U.S.C. § 77o, provides that controlling persons shall be "jointly and severally" liable with those whom they control for violations of Section 11 or Section 12 of the 1933 Act, 15 U.S.C. §§ 77k and l, which deal with false statements or omissions in a registration statement, prospectus, or other communication to the purchaser of a security.[14] Claims brought against the controlled person pursuant to Sections 11 or 12 of the 1933 Act are expressly limited by a one-year statute of limitations contained in Section 13 of the Act, 15 U.S.C. § 77m. Since the liability of the controlling person is joint and several with the controlled person, the same limitations period logically applies to the controlling person. See Payne v. Fidelity Homes of America, Inc., supra. Accordingly, a one-year statute of limitations applies to claims under the controlling person provision of the 1933 Act.
 
 
 54
 Section 20 of the 1934 Act, 15 U.S.C. § 78t(a), provides for joint and several liability of controlling persons for claims brought under the 1934 Act.[15] The plaintiffs in this case seek to hold the defendants liable as controlling persons for violations of Section 10(b) of the 1934 Act. Although this section does not contain a statute of limitations, we have determined above that the Kentucky Blue Sky law statute of limitations applies. Since the same limitations period will be applied to controlling persons as is applied to those they control, this Blue Sky limitations period will also be applicable to claims brought under section 20(a) of the 1934 Act.
 
 
 55
 The final inquiry of this section is what statute of limitations should be borrowed for claims brought under the Investment Company Act.[16] Claims brought under the Investment Company Act fall into four basic categories:
 
 
 56
 The enumerated practices found to have an adverse effect upon the national public interest and the interest of investors fall into the following categories: (1) failure to provide adequate, accurate information to prospective investors and shareholders in investment companies; (2) management of portfolios in the interest of managements and their affiliates rather than in the interests of the shareholders; (3) use of unsound, misleading, and unsupervised accounting practices; and (4) changes in the character of the company's business without the consent of the shareholders.
 
 
 57
 Motley, Jackson & Barnhard, Federal Regulation of Investment Companies Since 1940, 63 Harv.L.Rev. 1134, 1140 n.27 (1950). Which statute of limitations a federal court will borrow depends upon the nature of the claims in the particular case. Those courts which have considered the question have borrowed the state statute of limitations which comes closest to resembling the particular claim. See, e. g., Esplin v. Hirschi, 402 F.2d 94, 101-02 (10th Cir. 1968), cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); Lamb v. United Security Life Company, 59 F.R.D. 44, 46 (S.D.Iowa 1973). Cases which contain claims under the Investment Company Act often contain analogous claims under Section 10(b) of the 1934 Act and, therefore, courts often borrow the same statute of limitations. In this case, the claims are based on the failure to provide adequate and accurate information to the CSI investors prior to the merger with DBFC. Since these actions are akin to violations of Section 10 of the 1934 Act, we will borrow the same limitations period. Accordingly, the Kentucky Blue Sky statute of limitations applies to actions brought under the Investment Company Act of 1940.
 
 
 58
 To summarize our holding with regard to the applicable statutes of limitation, we repeat that the Kentucky Blue Sky law limitations period, rather than the Kentucky five-year general fraud limitations period, applies to plaintiffs' claims under Section 10(b) and 20(a) (controlling persons provision) of the 1934 Act, Section 17 of the 1933 Act, and plaintiffs' claim under the Investment Company Act. Plaintiffs' claim under Section 15 of the 1933 Act (controlling persons provision) is limited by the one-year period contained in Section 13 of the Act (controlled persons provision).
 
 IV.
 
 59
 On June 16, 1972, the statute of limitations contained in the Kentucky Blue Sky law, KRS 292.480(3), was lengthened from two to three years. The issue is whether actions viable at the time of the amendment receive the benefit of the longer period. The district court concluded such claims were still governed by the two-year period since the appellants should have been put on notice of the alleged violations prior to the amendment. We disagree.
 
 
 60
 Claims brought under the federal securities acts are affected by changes in the underlying state statute from which the limitations period is borrowed. See, e. g., McNeal v. Paine, Webber, Jackson & Curtis, Inc., 598 F.2d 888, 893 n.9 (5th Cir. 1979), in which the Fifth Circuit observed that "it is undeniably untidy to insist that the statute of limitations applicable to a federal cause of action vary from time to time dependent upon changes in local law.... that circumstance, however, is an unavoidable side effect of the basic rule of requiring application of state statutes of limitation."
 
 
 61
 Application of an amendment lengthening a state statute of limitations to causes of action under the federal securities acts viable at the time of amendment is particularly suitable since the limitations period is not contained in the federal statute creating the right sued upon, so that it does not qualify the right, but only affects the remedy.[17]
 
 
 62
 The purpose of the longer limitation period is to give a person with a federal claim at least as long an opportunity to sue as a person with a state claim. Carothers v. Rice, supra. We must inquire, therefore, whether Kentucky would apply the amended statute of limitations to claims viable at the time of amendment. See, e. g., Cannon v. Johnson, Lane, Smith & Co., Inc., 460 F.Supp. 724 (D.S.C. 1978) (holding that the South Carolina Supreme Court would, if faced with the issue, apply the amended limitations period), aff'd., 638 F.2d 12 (4th Cir. 1980).
 
 
 63
 In Kiser v. Bartley Mining Co., 397 S.W.2d 56 (Ky. 1965), the court was faced with two different statutes of limitations. The first provided that an action for workers compensation for an occupational disease must be brought within one year of the termination of employment or the manifestation of that disease. The second statute provided that an action based on silicosis must be brought within three years after the last exposure to the dangerous material. A worker had filed a claim within the first limitations period, but not within the latter. However, the latter statute of limitations, dealing with silicosis, had been repealed before the three-year period expired. The court treated the repeal of the statute as a lengthening of the limitations period and, applying the amended period, held that the action was not barred.
 
 
 64
 Kiser has recently been interpreted as follows:
 
 
 65
 Generally speaking, the law in this Commonwealth is that the statute in effect on the date of the injury is controlling. Maggard v. International Harvester Company, Ky., 508 S.W.2d 777 (1974). Maggard, however, was concerned with increased benefits by statutory change. We do note that some statutes which relate to remedies or modes of procedures are excepted from the general rule. 73 Am.Jur.2d Statutes § 354. Peach has directed our attention to Kiser v. Bartley Mining Company, Ky., 397 S.W.2d 56 (1965). In Kiser, the Court was of the opinion that if the original statute of limitations had not run by the time a new statute of limitations became effective, the applicable limitation period would be enlarged to the new limitation.
 
 
 66
 Peach v. 21 Brands Distillery, 580 S.W.2d 235, 236 (Ky.App. 1979) (emphasis added).[18]
 
 
 67
 The Kentucky court would therefore apply the amended three-year statute of limitations to actions viable at the time of amendment where the legislature did not create a new liability, but only extended the limitations period. Kiser v. Bartley Mining Company, supra. Since this comports with the policies of the federal security laws, we hold that the longer limitations period applies to actions which are not barred at the time of amendment.
 
 
 68
 The district court determined that the statute of limitations for causes of action based on the 1933 and 1934 Acts began to run on July 10, 1970. The Kentucky Blue Sky limitations period was lengthened from two to three years on June 16, 1972. Since this was within two years of July 10, 1970, the amended limitations period must be applied. The defendants were named in a complaint filed on October 20, 1972, well within the three-year period which ended on July 10, 1973. It was therefore error to grant summary judgment based on the limitations period for actions brought under Sections 10(b) and 20 of the 1934 Act and Section 17 of the 1933 Act.
 
 V.
 
 69
 Although we look to state law to determine which statute of limitation should apply to the analogous federal cause of action, it is federal law which determines the date on which a statute of limitation in a securities case begins to run. Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Bailey v. Glover, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636 (1875); Gaudin v. KDI Corp., 576 F.2d 708 (6th Cir. 1978). Under federal law a statute of limitations begins to run when "the fraud is or should have been discovered." Vanderboom v. Sexton, 422 F.2d 1233, 1240 (8th Cir.) (quoted in Gaudin v. KDI Corp., supra), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). See also Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402 (2d Cir. 1975). The Sixth Circuit requires an investor to exercise reasonable care in discovering the alleged fraud, assuming that the investor is "at least a person of ordinary intelligence." Gaudin v. KDI Corp., supra. Our circuit has also imposed upon the plaintiff a positive duty to use diligence in discovering the existence of a cause of action. Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389 (6th Cir. 1975).
 
 
 70
 A court may properly determine the commencement date for a statute of limitations on summary judgment in the context of a securities case. Gaudin v. KDI Corp., supra; Jablon v. Dean Witter & Co., 614 F.2d 677 (9th Cir. 1980). The facts upon which the district court may rely must be sufficient to enable a court to conclude as a matter of law that a reasonably diligent person should have discovered the participation of the particular defendant by the date the fraud should have been discovered. Robertson v. Seidman & Seidman, 609 F.2d 583 (2d Cir. 1979). Whether this standard has been met, of course, depends on the circumstances involved in each case.
 
 
 71
 Here the district court determined that the combination of three separate events should have put the plaintiffs on notice by July 10, 1970 for claims brought under the "controlling person provision of Section 15 of the 1933 Act.[19] The first event is an order from the Kentucky Department of Banking and Securities issued on July 24, 1969, directed to State Securities, Inc., a firm in Louisville, Kentucky, which was trading DBFC stock. The order suspended trading in DBFC stock because of possible violations of the Kentucky Blue Sky laws, including the failure to maintain proper records and the participation in prohibited conduct and transactions. The second event is a complaint filed on May 29, 1970 by a creditor of DBFC initiating insolvency proceedings against the company. Section V of the complaint stated:
 
 
 72
 That the Defendant, Daniel Boone Fried Chicken, Inc. is unable to pay its debts as they mature and has ceased to operate as a going business; is selling, disposing of its assets to the detriment of its general creditors; that Plaintiff believes and accordingly states that said corporation is insolvent and that the true market value of its assets are insufficient to pay its liabilities; that numerous other general creditors have filed suits against Defendant, and one major creditor has started foreclosure proceedings on certain real properties owned by this said Defendant.
 
 
 73
 The final event is the initiation of an action by the SEC against DBFC on July 10, 1970. An article entitled "SEC Seeks Injunction in Boone Chicken Suit" appeared on the front page of the afternoon edition of The Lexington Leader on July 10, 1970 and summarized the complaint against DBFC based upon fraud and misrepresentations.
 
 
 74
 We conclude that the district court correctly determined on summary judgment that the statute of limitations based on the controlling persons provision of the 1933 Act began to run by July 10, 1970. The last of these three events took place slightly more than a year after Dinkler read the press release exalting the success of DBFC. A reasonable investor who was aware of Dinkler's press release and the connection of his name with DBFC should have been led by these events to question his involvement with the company. The three events clearly demonstrate that DBFC was a failing company. This is not a case in which law suits alone have been filed against the company. Rather, by July 10, 1970 the two agencies responsible for regulating securities had taken serious action against DBFC and the trading of its stock.
 
 
 75
 We reach the same conclusion with respect to the CSI Directors. The extent of their involvement was clearly known by May 19, 1969 when they approved the merger with DBFC. These subsequent events should have put the plaintiff stockholders on notice that there was something terribly wrong with the decision to merge with DBFC.
 
 
 76
 Since the second amended complaint was filed on October 20, 1972, more than fifteen months after the one-year limitation period expired, the district court was correct in granting summary judgment against plaintiffs on their claim under Section 15 of the 1933 Act, 15 U.S.C. § 77o.
 
 
 77
 The plaintiffs also assail the district court's conclusion that the statute of limitations period for the Investment Company Act claim began to run on May 19, 1969, the date on which the CSI directors voted for the merger and ten days after the explanation and other materials had been sent to the CSI shareholders. If this finding is correct, then the two-year unamended statute of limitations contained in the Kentucky Blue Sky law bars the claims.[20] We conclude, however, that the district court incorrectly determined on summary judgment that May 19, 1969 was the date on which the statute of limitations for claims under the Investment Company Act began to run. The district court based its conclusion on the assumption that a reasonable investor should have wondered at that time whether the proxy material they received had been properly submitted to and approved by the SEC. Although CSI had a history of noncompliance with SEC requirements, it cannot be said as a matter of law that the stockholders should have questioned the particular proxy materials involved here. Otherwise, every CSI investor would always be required to investigate whether materials received from the company were in compliance with the SEC requirements. Moreover, a material fact is present as to whether the plaintiffs should have been aware by May 19, 1969 that there was a conflict of interest because of "affiliated persons" associated both with CSI and DBFC.
 
 VI.
 
 78
 The plaintiffs claim the statute of limitations should have been tolled by fraudulent concealment on the part of the defendants. Arneil v. Ramsey, 550 F.2d 774 (2d Cir. 1977).
 
 
 79
 The Federal Rules of Civil Procedure require that fraudulent concealment be pleaded with particularity:
 
 
 80
 Under F.R.Civ.P. 9(b), the party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity. Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendant; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; (3) plaintiff's due diligence until discovery of the facts.
 
 
 81
 Dayco Corp. v. Goodyear Tire & Rubber Company, supra. Paragraph three of the general allegation section of plaintiff's complaint alleged the fraud in this case:
 
 
 82
 The acts, practices, omissions, courses of business dealings, and transactions complained of herein which were practiced and carried out by certain of the Defendants, were accomplished or carried out in a clandestine and circuitous fashion in order to conceal from the Plaintiffs the illegal nature thereof.
 
 
 83
 This does not meet the requirement of F.R.Civ.P. 9(b) that "the circumstances surrounding fraud or mistake shall be stated with particularity."
 
 VII.
 
 84
 Although we have found that summary judgment based on the statute of limitations was not proper except for claims under the controlling person provisions in Section 15 of the 1933 Act, 15 U.S.C. § 77o, our inquiry is not at an end. An appellate court can find an alternative basis for concluding that a party is entitled to summary judgment and ignore any erroneous basis relied upon by the district court, provided it proceeds carefully so the opposing party is not denied an opportunity to respond to the new theory.[21] U. S. v. General Motors Corp., 518 F.2d 420, 440-1 (D.C.Cir.1975). Accord, Fristoe v. Reynolds Metals Co., 615 F.2d 1209 (9th Cir. 1980); Lindsay v. Dayton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979); 8 Wright & Miller § 2716. Cf. Getty v. Reed, 547 F.2d 971 (6th Cir. 1977). A defendant may raise an alternative theory without cross-appealing. Stern v. Merrill Lynch, Pierce, Fenner & Smith, 603 F.2d 1073 (4th Cir. 1978); Cf. Jafke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957).
 
 
 85
 A. We are obliged to conclude that questions of material fact exist with respect to claims brought against Dinkler under Section 10(b) of the 1934 Act. A person may be secondarily liable under the securities law as an aider or abettor, through a conspiracy, or by virtue of being a controlling person. SEC v. Coffey, 493 F.2d 1304, 1315-18 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975), sets forth the elements required to make one an aider or abettor under the securities laws:
 
 
 86
 Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.
 
 
 87
 493 F.2d at 1316. It cannot be determined from the record as a matter of law that Dinkler was not aware that he was participating in a scheme to mislead potential investors when he read the press release containing false statements concerning DBFC. This is particularly true because of his evasive practices in the depositions. Nor is the record conclusive as to whether Dinkler had the requisite state of mind for a Rule 10b-5 claim. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375 (1976). The law of this circuit is that either scienter or recklessness is sufficient to fulfill this requirement. Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979). There are also questions of material fact as to causation, materiality and reliance.
 
 
 88
 We find, however, that claims brought against Dinkler as a controlling person cannot survive a motion for summary judgment. The record does not show that Dinkler, although allegedly a director of DBFC, exercised even an indirect means of influence on DBFC. See Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). A director of a corporation is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed. Holloway v. Howerdd, 377 F.Supp. 754 (M.D.Tenn.1973), aff'd 536 F.2d 690 (6th Cir. 1976). See also Mader v. Armel, 461 F.2d 1123 (6th Cir.), cert. denied, 409 U.S. 1032, 93 S.Ct. 465, 34 L.Ed.2d 315 (1972). The record in this case is silent as to how Dinkler exercised any control over the corporation. His position as a director, if anything, was only a misrepresentation which could have misled potential investors.
 
 
 89
 B. We find that actions brought against the CSI directors under Section 10(b) of the 1934 Act cannot survive a motion for summary judgment. The Rule 10b-5 claim against these directors is that they failed to investigate DBFC properly before approving the merger and were responsible for misrepresentations and omissions contained in material sent to the stockholders of CSI. A Rule 10b-5 action is not a substitute for an action based on breach of a director's fiduciary duty. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 54, 50 L.Ed.2d 74 (1977); Marsh v. Armada Corp., 533 F.2d 978 (6th Cir. 1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). The failure to make a proper investigation of DBFC is therefore not cognizable under the 1934 Act.
 
 
 90
 The directors here were on the outer perimeter of the decision to merge with DBFC. Nothing in the record contradicts their deposition testimony that they had nothing to do with the proxy materials and explanation sent out to the shareholders which contained the alleged misrepresentations. Since there is no showing that they controlled any of those responsible for the preparation of these materials, they cannot be held liable as controlling persons. As we discussed above, one in a position of a director does not automatically control. Mader v. Armel, supra.
 
 
 91
 We also find that the claims under the Investment Company Act against the directors cannot survive a motion for summary judgment. First, the Investment Company Act does not create a private right of action for breach of fiduciary duties except in a limited situation not present here. 15 U.S.C. § 80a-35. Second, the directors cannot be held liable as controlling persons for CSI's violations of the Investment Company Act, 15 U.S.C. § 80a-47, because they were not shown to be in a position of control. The directors did not participate in drafting the explanation sent to the shareholders which neglected to disclose certain affiliated persons, nor did they approve this release before it was sent out to the shareholders. Under the circumstances, we do not find that the directors could be considered to have exercised the requisite control over CSI so as to be liable for violations of the Investment Company Act.
 
 VIII.
 
 92
 Accordingly, we reverse the grant of summary judgment in favor of defendant Dinkler for claims brought under Section 10(b) of the 1934 Act seeking to hold him liable as an aider or abettor and remand for further proceedings on this claim. We find that summary judgment was properly granted with respect to all the other claims brought against Dinkler and the other defendants involved in this appeal.
 
 
 
 [1]
 DBFC was founded on February 9, 1968, as Colonel Chicken of Kentucky, Inc. In August of that year, the name was changed to Daniel Boone Fried Chicken, Inc
 
 
 [2]
 Many more defendants were named in the complaints. The district court, pursuant to F.R.Civ.P. 54(b), determined that the summary judgment for the particular defendants before us were final appealable orders and that there was no reason for delay
 
 
 [3]
 Although notice had been sent to thirteen members of the media, only two reporters were present at the press conference
 
 
 [4]
 An answer to an interrogatory propounded by Dinkler provides:
 Without waiving such objection but insisting upon the same, we state that we do not know whether he was ever "duly elected" a director. We do not know whether such minutes of Daniel Boone as are now in the custody of the Trustee in Bankruptcy of Daniel Boone constitute all of the minutes of Daniel Boone. The minute book of Daniel Boone in the possession of the Trustee does include minutes of a special meeting of the Board of Directors of Daniel Boone held on March 12, 1969, at which defendant Dinkler was "recommended" by the Board of Directors for future presentation of the corporation's stockholders for membership on the Board of Directors.
 
 
 [5]
 The complaint was not drafted in terms of violations of particular statutory provisions
 
 
 [6]
 CSI even had to offer to return this money because it had failed to register as required by the Investment Company Act of 1940
 
 
 [7]
 A. B. Chandler, Sr. and J. Dan Chandler abstained from voting, apparently because of the conflict of interest created by their involvement with DBFC
 
 
 [8]
 Chandler's deposition contains his impressions of the other three directors. He stated that Alves and Dunlap were as far removed from CSI's operations as possible. He had met Badgett on the day of the meeting and did not think that he was on the CSI board
 
 
 [9]
 Section 292.480 (the Blue Sky provision) of the Kentucky Revised Statute provides:
 
 
 [292]
 480 Civil liabilities
 (1) Any person, who offers or sells a security in violation of KRS 292.340 or 292.350 or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less (a) the value of the security when the buyer is disposed of it and (b) interest at six percent per annum from the date of disposition.
 (2) Every person who directly or indirectly controls a seller liable under subsection (1), every partner, officer, or director (or person occupying a similar status or performing similar functions) or employe of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.
 (3) Any tender specified in this section may be made at any time before entry of judgment. Every cause of action under this statute survives the death of any person who might have been a plaintiff or defendant. No person may sue under this section more than three years after the contract of sale.
 
 
 [10]
 We had previously decided that in other states the general fraud statute of limitations is more appropriate to actions brought under the federal securities acts. See, e. g., IDS Progressive Fund, Inc. v. First of Michigan Corporation, 533 F.2d 340 (6th Cir. 1976) (Michigan law); Nickels v. Koehler Management Corp., 541 F.2d 611 (6th Cir. 1976) (Ohio law) cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)
 
 
 [11]
 Section 292.530 of the Kentucky Revised Statutes provides that the Blue Sky laws "shall be construed so as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and the administration of this chapter with the related federal regulation."
 
 
 [12]
 The Supreme Court has not ruled on whether a private right of action exists for claims brought under Section 17 of the 1933 Act. The courts are in disagreement as to whether such an action exists. Compare Kirshner v. United States, 603 F.2d 234, 240-41 (2nd Cir. 1978) (private right of action exists), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), and SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 867 (2nd Cir. 1968) (Friendly, J., concurring) (once a private cause of action is found under Section 10(b) of the 1934 Act, there is little practical point in denying private cause of action under Section 17 of the 1933 Act) with Shull v. Dain, Kalman & Quail, Inc., 561 F.2d 152 (8th Cir. 1977) (no private right of action), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), and McFarland v. Memorex Corp., 493 F.Supp. 631, 649-53 (N.D.Cal.1980) (legislative history reveals no intent to create private right of action). Since the issue was not raised in this appeal, we assume, without deciding, that a private right of action exists. See Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979)
 
 
 [13]
 It is not clear what state of mind is necessary to succeed in a private cause of action brought under Section 17. The Supreme Court has recently ruled in the context of an SEC enforcement proceeding that scienter is required for Section 17(a)(1), but not Sections 17(a)(2) or (3). Aaron v. SEC, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)
 
 
 [14]
 Sections 11 and 12 of the 1933 Act expressly provide a private right of action. Section 15, the controlling person provision, provides:
 Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled persons to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
 
 
 [15]
 Section 20(a) of the 1934 Act provides:
 (a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 [16]
 It is not clear whether a private right of action exists under the Investment Company Act of 1940. In Burks v. Lasker, 441 U.S. 471, 475-76, 99 S.Ct. 1831, 1835-36, 60 L.Ed.2d 404 (1979), the existence of a private right of action under the Investment Company Act of 1940 was not disputed so the Court assumed without deciding that there was an implied, derivative cause of action. The Court stated in footnote 5 of the opinion, 441 U.S. 476 n.5, 99 S.Ct. at 1836, that the appellate courts which had faced the issue were in agreement that such a cause of action existed. However, since that case, the Supreme Court has decided that a private right of action does not exist under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq., the sister statute of the Investment Company Act of 1940. Transamerica Mortgage Advisers v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Since the existence of a private right of action under the Investment Company Act of 1940 is not raised, we assume, without deciding, that such a cause of action exists
 
 
 [17]
 A statute of limitations may be interpreted either as going to the right or to the remedy. See, e. g., Davis v. Mills, 194 U.S. 451, 454, 24 S.Ct. 692, 693, 48 L.Ed. 1067 (1904). If the limitation "qualifies the right," an amendment lengthening it will not serve to alter the limitations period with respect to causes of action which have already accrued. However, if the limitations period is not contained within the statute creating the right itself (or is not directed to the newly created liability), it is said to go to the remedy and is applicable to causes of action which are then viable
 
 
 [18]
 Callahan v. Chesapeake and Ohio Rwy., 40 F.Supp. 353 (E.D. Ky. 1941), relied on by the defendants, dealt with an amendment to the Federal Employer's Liability Act extending the statute of limitations for claims brought under it. Since the limitation was contained in the Act itself, it provided an integral part of the right. Accordingly, the court refused to apply the amended limitations period. Callahan is not controlling here since it involves a federal statute containing its own limitations period which therefore affects the right. Moreover, the court applied federal and not Kentucky law. In contrast, the right in this case is created by the federal securities statutes; the limitations period is in a different statute, the state Blue Sky law
 Nor does the case of Everman v. Miller, 597 S.W.2d 153 (Ky.App. 1979), provide support for the defendants' claim that Kentucky is averse to applying an amended longer period of limitations. The court refused to apply the limitations period contained in the new state no fault law because the original statutory period for bringing a tort suit had not been repealed and the rest of the new statutory scheme was not applicable to the particular case. None of these factors are present here.
 
 
 [19]
 This is the only cause of action under the 1933 or 1934 Act not governed by the three-year statute of limitations. See discussion at pp. 678-680, supra
 
 
 [20]
 The two-year period applies since the amendment of the Kentucky Blue Sky statute of limitations took place after the two-year period had expired on May 19, 1971. An expansion of the limitations period cannot revive actions which have been barred by the running of the earlier limitations period. See, e. g., Davis v. Valley Distributing Co., 522 F.2d 827, 830 (9th Cir. 1975), cert. denied, 429 U.S. 1090, 97 S.Ct. 1090, 51 L.Ed.2d 535 (1977). See generally 51 Am.Jur.2d § 44
 
 
 [21]
 In this case, the reply brief addressed the alternative theory. Moreover, the theory had been presented to the court below in the motion for summary judgment. The court did not reach it because of its disposition of the case on the statute of limitations issue