Carolyn CAPRONI, Plaintiff–Appellant,

v.

PRUDENTIAL SECURITIES, INCORPORATED; Terrance W. Sullivan; and Ronald J. Chewning, Defendants–Appellees.

No. 92–2282.

United States Court of Appeals, Sixth Circuit.

Submitted Aug. 2, 1993.

Decided Feb. 7, 1994.

Jerome P. Pesick and Jonathan B. Frank (briefed), Mason, Steinhardt & Jacobs, Southfield, MI, for plaintiff-appellant.

Edward M. Kronk, Ronald E. Reynolds, and Sheldon H. Klein (briefed), Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, for defendants-appellees.

Before: MILBURN, RYAN, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

## I.

Plaintiff Carolyn Caproni came into some money in 1984 as a result of the sale of a family owned newspaper; she received $800,000 in cash plus $400,000 paid to her over ten years. Mrs. Caproni says she spent most of her life as a housewife and thus had little or no knowledge regarding investments, so she went to her tax attorney, Gary Matthews, for advice on what to do with the money. Matthews put her in touch with defendant Terrance Sullivan, who was an investment broker with defendant Prudential Securities (Prudential) in Michigan. After meeting Sullivan once, Caproni had Matthews write a letter to Sullivan outlining her "investment objectives," which were to invest the money safely and conservatively so as to protect the principal while producing approximately $75,000–$90,000 in income yearly. On May 9, 1984, Sullivan wrote Caproni a letter outlining several proposed investments. On May 12, 1984, Caproni met with Sullivan again to talk about what to do; as a result of the meeting, Caproni bought a $50,000 share of Almahurst Bloodstock IV, a limited partnership dealing in "standardbred" horses. By December 31, 1985, Caproni had made a total of six different investments on Sullivan's recommendation; her principal totalled over $330,000.

Unfortunately, the horses (as well as the other investments) turned out to be dogs; Sullivan had actually recommended highly risky investments in oil and gas, aviation equipment leasing, and real estate. Caproni says Sullivan never advised her of the risk (although she admits he said they would net between 12% and 17% annually) and she claims she did no more than scan the prospectuses and other papers Sullivan sent her to read and sign. By mid–1985, some of the initial investments had begun to do poorly; Caproni noticed a sharp decrease in the amount of some of her dividend checks. By 1986, Prudential had fired Sullivan as a result of a New York Stock Exchange investigation of his activities, and Caproni's accounts were referred to another Prudential broker, Verna Katz, who recommended between March and August 1986, that Caproni sell the investments and cut her losses. By August 1987, Caproni had sold off many of these investments and claims that the rest had become worthless.

Mrs. Caproni filed this action in Michigan on June 17, 1991, naming as defendants Prudential Securities, Incorporated, Terrance

Sullivan, and his supervisor Ronald Chewning and claiming losses of $269,042.90 on her investments and other damages. The complaint contained six counts alleging violations of §§ 10(b) and 15 of the Securities Exchange Act of 1934, violations of RICO, breach of fiduciary duty, breach of the Michigan Consumer Protection Act, common law fraud, and breach of contract.

The district court granted defendants' motion to dismiss the count based on the Michigan Consumer Protection Act on the ground that it failed to state a claim on which relief could be granted.[1] Subsequently, the district court granted defendants' motions for summary judgment on the securities fraud and RICO claims, finding that because "prior to June 18, 1987," Caproni knew or should have known that her investments had gone sour and that Sullivan had intentionally flouted her desire for a conservative investment plan these claims were time-barred. The court then dismissed the pendent state claims described in the remaining three counts. The district court thus disposed of this entire case, and this timely appeal followed.

## II.

### A.

The district court granted summary judgment on plaintiff's claims of securities fraud and RICO violations, holding that, as a matter of law, those claims were time-barred. Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56. A district court's grant of summary judgment is reviewed de novo. *Pinney Dock & Transp. Corp. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). A district court's determination of state law is also reviewed de novo. *Salve Regina College v. Russell*, 499

U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). We deal first with the securities fraud claims.

Where a federal statute lacks a statute of limitations, courts have looked to "borrow" the state statute of limitations from the state law most "analogous" to the federal law. *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985). Prior to the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, ——, 111 S.Ct. 2773, 2778, 115 L.Ed.2d 321 (1991), this was the rule followed by most federal district courts hearing cases alleging violations of §§ 10(b) and 15 of the Securities Exchange Act of 1934. *Lampf*, however, held that shareholder fraud actions under the Securities Exchange Act of 1934 (usually known as "10b–5" actions, after the Securities and Exchange Commission regulation enabling this type of civil action) were governed by a three year statute of repose, or a one year limit from the plaintiff's date of discovery of the wrong, rather than by applicable state limitations periods. Under *Lampf*, the district court dismissed Caproni's claims on January 6, 1992. By that time, however, Congress had acted to abolish the retroactive effect of *Lampf* by enacting 15 U.S.C. § 78aa–1, commonly known as "Section 27A," which applied only to cases that had been filed by the time *Lampf* was decided in June 1991; the statute of limitations for those cases was declared to be whatever limitations law was applicable prior to the decision in *Lampf*. The parties to the case at bar stipulated to the applicability of § 78aa–1 to their case, and pursuant to this stipulation, the district court reinstated the case on February 19, 1992. While defendants reserved the right to challenge the constitutionality of § 78aa–1, they have waived this issue for the purposes of the present appeal.[2]

---

1. The district court also dismissed the federal securities fraud claims on the ground that the three year statute of repose decreed in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), required a finding that this claim was time-barred. However, after Congress's enact-

ment of 15 U.S.C. § 78aa–1, the court, by stipulation of the parties, reinstated this claim.

2. *See* Brief of Defendants–Appellees at 18 n. 15 ("Prudential does not raise it as an alternate ground supporting the court's judgment. Thus, the issue is not before this court.").

The district court held that even in the absence of *Lampf*, plaintiff's claims would be time-barred under the applicable state statute of limitations. The court declined to apply the six-year statute of limitations for fraud actions of the forum state of Michigan [3] because it found that the cause of action had accrued in Kentucky and that the Michigan borrowing statute [4] was therefore applicable. Pursuant to that statute, the court applied the three-year Kentucky statute of limitations. Because the court found that the claim had accrued "prior to June 18, 1987," it held that the claim was untimely.

■ We hold first that the findings of fact upon which the district court based its conclusions that the federal securities fraud claim accrued in Kentucky "prior to June 18, 1987" are not clearly erroneous. The district court found that based on Sullivan's recommendations, the plaintiff bought most of the securities in 1984 and early 1985; her last purchase occurred in November 1985. The district court found that by the end of 1985 and early 1986, Caproni had become "grave[ly] concern[ed]" with several of the investments; her losses by this time had begun to manifest themselves. By August 1986, Caproni knew that her accounts had been transferred by Prudential to another broker, and that the new broker was urging her to sell the investments made for her by Sullivan and to cut her losses. And at approximately this same time, Caproni learned that Sullivan had been fired by Prudential because of the investigation of his activities by the New York Stock Exchange. During nearly all of this time, Caproni lived in Kentucky; she did not move to Alabama until sometime in 1986.

■ Federal law governs the determination of when the statute of limitations begins to run on a claim of federal securities fraud. *See Herm v. Stafford*, 663 F.2d 669 (6th Cir.1981). The statute of limitations in such a case begins to run when the fraud is or should have been discovered. *Id.* at 682. We hold that the district court did not err in finding that Caproni's 10b–5 cause of action had accrued "prior to June 18, 1987."

■ Plaintiff claims, however, that although the district court was required to look to the law of the forum state to determine what statute of limitations to apply to this claim, the court erred in holding that the claim accrued in Kentucky and in applying the Michigan borrowing statute. Citing this circuit's decision in *Champion Int'l Corp. v. United Paperworkers Int'l*, 779 F.2d 328 (6th Cir.1985), plaintiff argues that using the borrowing statute to invoke the shorter Kentucky limitations period is inconsistent with federal policy, and that this circuit has rejected the use of such borrowing statutes. Plaintiff further maintains that we have held squarely that federal securities fraud policy favors longer, rather than shorter, limitations periods, citing *Herm* and *IDS Progressive Fund, Inc. v. First of Michigan Corp.*, 533 F.2d 340 (6th Cir.1976).

However, we do not read *Champion* as standing for the proposition that adoption of the forum state's borrowing statute is prohibited in cases such as this one. Rather, we think *Champion* is properly read to hold that such adoption is not *mandatory* where the federal law being applied has no statute of limitations, and, more importantly, where such adoption would make applicable a time bar inconsistent with federal policy. *See Champion*, 779 F.2d at 332–33. We do not doubt that in a § 301 case, which *Champion* was, "the application of a state borrowing statute in a [labor arbitration] case will comport with federal labor policy only coincidentally, if at all." *Id.* at 333. However, we do not believe that *Champion* intended to prohibit the application of state borrowing statutes in every federal question case.

---

**3.** Mich.Comp.Laws Ann. § 600.5813 provides for a six-year statute of limitations for fraud.

**4.** Mich.Comp.Laws Ann. § 600.5861 (1987) reads:

An action based upon a cause of action accruing without this state shall not be commenced after the expiration of the statute of limitations of either this state or the place without this state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of this state the statute of limitations of this state shall apply.

618

In *Herm* we held that the Kentucky Blue Sky laws statute of limitations rather than the limitations period for fraud was applicable to a federal securities fraud action in Kentucky, and that the amendment to the statute increasing the Blue Sky limitations period was applicable to actions viable at the time the change was enacted. In holding that the Blue Sky limitations period was the appropriate one, we quoted from *Carothers v. Rice*, 633 F.2d 7 (6th Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1702, 68 L.Ed.2d 199 (1981), another case in which we held that the shorter Kentucky Blue Sky law statute of limitations rather than the longer statute of limitations for fraud was the appropriate limitations period for a federal securities fraud action:

> This Court has previously said that the broad remedial purposes of the federal securities laws are best served by longer, not shorter, statute of limitations. But the reason for using the longer statute of limitations for a federal securities claim is to give the person with a federal claim at least as long an opportunity to sue as a person with a state claim.

*Herm*, 663 F.2d at 678. We then reiterated this premise in holding that the change in the statute applied to actions viable at the time the change was enacted, saying, "The purpose of the longer limitation period is to give a person with a federal claim at least as long an opportunity to sue as a person with a state claim." *Herm*, 663 F.2d at 681 (citation omitted). And *IDS Progressive Fund*, a federal securities fraud class action brought in Michigan, did not address the issue of use of a state borrowing statute, but simply applied the six-year Michigan limitations period for fraud, opining that "the broad remedial policies of the federal securities laws are best served by a longer, not a shorter statute of limitation." 533 F.2d at 344.

We think that the presumption that federal securities laws policies are best served by longer limitations periods cannot have survived *Lampf*, where the Supreme Court expressly rejected the application of state limitations periods to federal securities fraud cases in favor of a federal statute of repose. "[W]e . . . reject plaintiff-respondents' asser-

tion that state-law fraud provides the closest analogy to § 10(b)." *Lampf*, —— U.S. at ——, 111 S.Ct. at 2781. Regardless of whether the substance of *Lampf*'s limitations periods applies to the present case (and defendants apparently concede that it does not) *Lampf* is still the law. Congress acted only to eliminate the retroactive application of *Lampf*'s "federal" limitations periods to cases already filed by the time that case was decided. In enacting § 27A Congress hardly indicated a preference for "longer" statutes of limitation for the narrow class of cases such as this one, since it acted to restore whatever limitations periods applied at the time the cases were filed; some of these periods were longer and some shorter than the uniform period *Lampf* prescribed. And certainly Congress did not express a preference for longer statutes of limitations for federal securities fraud cases filed post-*Lampf*, since for those cases it has left the period prescribed by *Lampf* in place. Thus, *Lampf* states in rather strong terms that federal interests are best served by shorter, not longer limitations periods, and, in adopting a statute of repose, suggests that finality is of paramount federal importance. *See Lampf*, —— U.S. at ——, 111 S.Ct. at 2781 (adoption of one year/three year time bar will not "frustrate the policies underlying § 10(b)"). While Congress could have "corrected" *Lampf's* general interpretation of federal policy by enacting a different uniform limitations period, it did not; we should assume, therefore, that Congress thought *Lampf* got it right. We hold that the district court also got it right, and did not err as a matter of law in holding that the Michigan borrowing statute was applicable and not in conflict with federal law. Therefore, the district court properly concluded that the Michigan borrowing statute required that the court determine where the claim accrued.

■ Neither the Sixth Circuit nor Michigan has caselaw describing where causes of action for securities fraud accrue. However, in the context of other torts, Michigan follows the common law in recognizing that a cause of action in tort accrues at the place the injury occurs or the place where the agent causing the injury manifests itself. *See, e.g., Shamie v. Shamie*, 45 Mich.App.

384, 206 N.W.2d 463 (1973) (under borrowing statute, shorter Illinois limitations period applies where auto accident occurred in Illinois); *see also Hill v. Clark Equipment Co.,* 42 Mich.App. 405, 202 N.W.2d 530 (1972) (borrowing statute requires court to apply Alabama law where industrial accident happened in Alabama).

■ The only Circuit which has set out a rule in securities fraud cases for place of accrual and consistently followed it appears to be the Second: a cause of action for securities fraud accrues "where [the fraud's] economic impact is felt, normally the plaintiff's residence." *Ceres Partners v. GEL Assoc.,* 918 F.2d 349, 353 (2d Cir.1990) (citations omitted). The only exception is where, in a class action suit, a multitude of plaintiffs from different jurisdictions would impose several different time bars on essentially the same claims; in that situation, the forum state has an interest in imposing its own limitations period for the sake of consistency. *See State Teachers Retirement Bd. v. Fluor Corp.,* 500 F.Supp. 278 (S.D.N.Y.1980), *aff'd in part and rev'd in part on other grounds,* 654 F.2d 843 (2d Cir.1981). The Second Circuit's sensible rule comports with the general Michigan rules regarding the accrual of other tort actions, as well as with the Michigan borrowing statute.

We hold that the district court did not err in determining that the plaintiff's claim accrued in Kentucky. Like the plaintiffs in *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir.1977) (holding that the place where the economic injury was suffered, Washington, is the place of accrual of a federal securities fraud action), of whom the court said, "to the extent they suffered a financial loss from their transaction with Blair, they suffered it in Washington[,] [t]o the extent they became poorer men, they became poorer Washingtonians," to the extent that Caproni became a poorer woman because of her transactions with Sullivan, she became a poorer Kentuckian.

The district court did not err in employing the Michigan borrowing statute to apply the Kentucky statute of limitations to plaintiff's federal securities fraud claim and in holding that the claim was untimely. The summary judgment as to that claim is affirmed.

## B.[5]

■ Plaintiff next argues that the district court erred in holding that her RICO claim was time barred. The parties agree that the limitations period for RICO claims is four years. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The dispute is over the accrual standard to be applied to RICO claims and whether the facts of this case meet that standard.

In *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233 (6th Cir.1992), this court applied the accrual rule of *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla., Inc.,* 906 F.2d 1546, 1554–55 (11th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), which it quoted as follows: "[A] civil RICO cause of action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *Agristor,* 967 F.2d at 241. This court then held that a claim barred by the *Bivens* rule would also be barred by the discovery rule.[6] "Under either the discovery rule or the *Bivens* rule, we hold that [plaintiff's] RICO claim is barred. If [plaintiff's] claim fails to satisfy the more generous *Bivens* rule, then it also fails under the discovery rule as well." *Id.*

The principal difference between the two rules, of course, is that the *Bivens* rule requires that a plaintiff discover, or be in a position to discover, the existence of a pattern of racketeering activity[7] in addition to

---

**5.** Parts II. B., II. C., and II. E. were written by Judge Milburn.

**6.** Quoting from *Hofstetter v. Fletcher,* 905 F.2d 897, 904 (6th Cir.1988), this court described the discovery rule as starting the running of the statute of limitations when "the plaintiff knew or

should have known of the defendants' fraudulent scheme." *Agristor,* 967 F.2d at 241.

**7.** Plaintiff alleged a pattern of racketeering activity consisting of mail fraud in violation of 18 U.S.C. § 1342, wire fraud in violation of 18 U.S.C. § 1343, and fraud in the sale of securities.

the existence and source of the injury. After applying the *Bivens* rule to the facts before it, this court in *Agristor* held that an intervenor's claim was barred by the four-year statute of limitations because the intervenor should have recognized a pattern of illegal representations at the same time as it should have discovered its injury.

In this case, the district court applied what it called the "compromise rule," which is the same rule described in *Agristor* as the "*Bivens*" rule. It held that, prior to June 18, 1987, the date four years before the filing of this action, plaintiff knew or should have known of the existence and source of her injury and that the injurious acts of the defendants were a part of a pattern. The district court noted that plaintiff began to have concerns about her investments as early as mid–1985, when her dividend from Consolidated Capital Income Trust began declining. The dividend from May Energy also declined in 1985. In August 1986, plaintiff sold her interests in Damson Oil at a tremendous loss, and a few months later, in December 1986, she had sold May Energy at a substantial loss. Moreover, by late 1985 or early 1986, Verna Katz, defendant Sullivan's replacement at Prudential, and Louis Ryan, an independent advisor to plaintiff, told her that the securities recommended by defendant Sullivan were not suited to plaintiff's need for safe, income-producing investments. By her own admission, plaintiff was "very concerned" about some or all of her investments by the spring of 1985, and by 1986 she had "grave concerns" about several of her investments.

These facts show that plaintiff should have known long before June 18, 1987, the date four years before the filing of this action, that defendants had misrepresented to her the nature of the investments they recommended. Because these recommendations were made at different times, plaintiff also should have known that they were part of a pattern of misrepresentation. Thus, by mid–1987, plaintiff had all the information she needed to undertake a due diligence investigation into the possibility that she had been defrauded by a pattern of defendants' conduct. It follows that the district court did not err in concluding that her RICO claim was time barred.

## C.

■ The district court dismissed Count IV of the complaint, which alleged a breach of the Michigan Consumer Protection Act ("MCPA"), Mich.Comp.Laws Ann. §§ 445.-901–445.922 on defendant's motion to dismiss for failure to state a claim upon which relief could be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure. In the district court's view, defendants' alleged conduct was not covered by the MCPA because Mich.Comp.Laws Ann. § 445.904(1)(a) exempts from the operation of the MCPA "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Section 445.904(3) places the burden of proving an exemption from the MCPA on the person claiming the exemption.

Plaintiff cites *Attorney General v. Diamond Mortgage Co.*, 414 Mich. 603, 327 N.W.2d 805 (1982), in support of her argument that the transactions involved in this case are not exempt from the coverage of the MCPA. In *Diamond Mortgage*, the Michigan Supreme Court held that a mortgage broker who had been sued for alleged violations of the state usury statutes was not exempted from the coverage of the MCPA by § 445.904(1)(a) merely because he had a real estate broker's license issued by the state. The court stated its rationale as follows:

> We agree with the plaintiff that Diamond's real estate broker's license does not exempt it from the Michigan Consumer Protection Act. While the license generally authorizes Diamond to engage in the activities of a real estate broker, it does not specifically authorize the conduct that plaintiff alleges is violative of the Michigan Consumer Protection Act, nor transactions that result from that conduct. In so concluding, we disagree that the exemption of § 4(1) becomes meaningless. While defendants are correct in stating that no statute or regulatory agency specifically authorizes misrepresentations or false promises, the exemption will nevertheless apply

where a party seeks to attach such labels to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." For this case, we need only decide that a real estate broker's license is not specific authority for all the conduct and transactions of the licensee's business.

*Id.* 327 N.W.2d at 811.

In *Kekel v. Allstate Ins. Co.*, 144 Mich.App. 379, 375 N.W.2d 455 (1985), however, the Michigan Court of Appeals distinguished *Diamond Mortgage* and held that, where insureds brought an action against an insurer based on a dispute arising under their no-fault insurance contract, their action did not state a claim under the MCPA because Mich. Comp.Laws Ann. § 445.904(1)(a) exempted the transaction from the coverage of the act.

> *Diamond* is distinguishable from the case at bar. The activities of the defendant in *Diamond* which the plaintiffs there were complaining of *were not subject to any regulation* under the real estate broker's license of the defendant and thus such conduct was not reviewable by the applicable licensing or regulatory authority. That is not true in this case. Allstate Insurance Company is subject to all of the provisions of the Insurance Code of 1956 including the Uniform Trade Practices Act of the Insurance Code. M.C.L. 500.2001 *et seq.;* M.S.A. § 24.12001 *et seq.* The insurance industry is under the authority of the State Commissioner of Insurance and subject to the extensive statutory and regulatory scheme, all administered "by a regulatory board or officer acting under statutory authority of this state." In addition, the conduct complained of by the plaintiffs in this case is subject to the regulation and scrutiny of the applicable licensing and regulatory authority.

*Id.* 375 N.W.2d at 458–59 (emphasis added).

The courts of Michigan thus seem to draw the distinction based on whether the conduct of the defendant is actually regulated. The mere fact that defendant in *Diamond Mortgage* possessed a real estate broker's license did not subject him to any particular state

regulation, whereas the defendant insurance company in *Kekel* was heavily regulated and thus exempt from the operation of the MCPA. The present case appears more analogous to *Kekel* than to *Diamond Mortgage* in that "the sale of securities in Michigan is regulated by the Michigan Uniform Securities Act, which is administered by the Corporation and Securities Bureau of the Michigan Department of Commerce." *Silverman v. Niswonger,* 761 F.Supp. 464, 471 (E.D.Mich.1991); *see* Mich.Comp.Laws Ann. § 451.806(a). For that very reason, the court in *Silverman* directly held that the MCPA does not apply to claims of securities fraud. *Id.* at 472. Another district court seated in Michigan has reached the same conclusion. *See Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.,* 713 F.Supp. 1019, 1030 (W.D.Mich.1989) (holding that "the 'overwhelming majority' of decisions [decline] to apply general state consumer protection statutes to the securities field"), *aff'd,* 933 F.2d 1008 (6th Cir.1991).

As plaintiff points out, some district courts have held that their state's consumer protection statutes do cover claims of securities fraud because their consumer protection statutes, unlike the statute in this case, do *not* contain exemptions for conduct regulated or permitted by governmental agencies. *See Denison v. Kelly,* 759 F.Supp. 199, 203 (M.D.Pa.1991). It nonetheless remains the case that most courts "follow the great weight of authority in finding that such statutes 'are generally held not to apply to securities.'" *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1309, 1325 (M.D.Tenn.1989) (quoting L. Loss, *Fundamentals of Securities Regulation* 799 (1983 ed. Supp.1986)). For the foregoing reasons, we believe that if the Michigan Supreme Court were called upon to decide this issue, it would conclude that the district court did not err in holding that plaintiff's securities fraud claims failed to state a claim for relief under the MCPA.

### D.

Plaintiff argues that the district court erred in dismissing her pendent state claims because (1) there remain viable federal

causes of action to which they may attach, and (2) the district court has an independent diversity jurisdiction over the state causes of action. Defendants concede that the district court has diversity jurisdiction over these claims. We hold that the district court did not err in finding that there was no federal cause of action to which these claims could attach. Because the issue of diversity jurisdiction was not addressed by the district court, we remand those claims to the district court for a determination of whether diversity jurisdiction exists and for such further proceedings as are then appropriate.

### E.

Defendants also attempt to argue (1) that even the Michigan six-year statute of limitations bars plaintiff's federal securities fraud claim, (2) that plaintiff did not reasonably rely on the alleged misrepresentations by defendants, and (3) that plaintiff's RICO claim should be dismissed because she failed to offer any evidence that her claim met RICO's essential elements. These matters were not addressed by the district court. The first two require fact finding that this court should not engage in on appeal, and the third is moot because the RICO claim stands dismissed. Finally, defendants' argument that plaintiff waived her appeal on her MCPA claim by failing to include it on her Civil Pre–Argument Statement is moot because that claim also stands dismissed.

### III.

For the reasons stated, the district court's judgment is AFFIRMED as to all claims except the state claims. The district court's judgment dismissing those state claims is VACATED, and those claims are REMANDED for a determination of diversity jurisdiction and such other proceedings as may then be appropriate.

MILBURN, Circuit Judge, concurring in part and dissenting in part.

I concur in parts I and II B, C, and E of the majority's opinion, but I respectfully dissent from parts II A and D, and III, because in my view the majority and the district court erred in adopting the Michigan "borrowing statute" and applying the Kentucky statute of limitations instead of the Michigan statute of limitations.

I believe the majority has misread our previous decision in *Champion International Corp. v. United Paperworkers International Union*, 779 F.2d 328 (6th Cir.1985). In *Champion*, as in the present case, we were faced with a federal cause of action that lacked a federal limitations statute, and had to decide whether to apply the forum state's borrowing statute or the most analogous state limitations statute. We held that the district court in Tennessee should apply Tennessee's statute of limitations rather than its borrowing statute, which would have required it to apply a Mississippi limitations period.

This court in *Champion* began its analysis by noting that "[i]n federal claim cases federal courts resort to state statutes of limitations primarily as a matter of expedience, not as a matter of mandatory law." *Id.* at 333. Thus, state statutes of limitations are adopted only where they "will not frustrate or interfere with the implementation of national policies." *Id.* (quoting *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 161, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983)). Because federal law must always govern whether a state's statute of limitations shall apply,

> [f]ederal law, rather than a state borrowing statute, should likewise govern the choice between the forum state's statute of limitations and that of another state in a Section 301 case. A borrowing statute obviously is not tailored to further federal labor policy.... For this reason the application of a state borrowing statute in a Section 301 case will comport with federal labor policy only coincidentally, if at all. In fact, a borrowing statute's "complex calculus of contacts and interests may produce considerable difficulty in application and uncertainty of outcome without any corresponding improvement of result."

*Id.* at 333–34 (quoting *Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494, 507 (3d Cir.1979), *vacated on other*

*grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980)).

*Champion* thus rejected the use of a forum state's borrowing statute because it served no federal policy and because the additional complexities and confusions attendant to its use were more trouble than they were worth. In so doing, this court approved the use of a federal choice-of-law rule, rather than state choice-of-law rules, including borrowing statutes. The federal choice-of-law rule requires only the direct application of the forum state's statute of limitations governing the state's most closely analogous substantive claim.

> Use of a federal choice of law rule avoids such confusion. Applying the appropriate federal choice of law rule, we conclude that the forum state's statute of limitations governing the most closely analogous state substantive claim controls, *unless* a party can demonstrate that the adoption of the forum state's limitation period will substantially undermine federal labor policy or cause the parties undue hardship.

*Id.* at 334 (emphasis added).

The majority reads *Champion* as merely holding that in a case such as this, where the federal statute does not provide a limitation period and the federal court must look to the forum state's statutes of limitation to determine the appropriate limitation period for the federal cause of action, the federal court is not required to use the forum state's borrowing statute if such use "would make applicable a time bar inconsistent with [f]ederal policy." However, I read *Champion* as holding that in those federal question cases where the federal court looks to the forum state's statutes of limitation for the appropriate limitation period, the court should not apply the forum state's borrowing statute unless a party shows that application of the forum state's statute of limitation will substantially undermine federal policy or cause the parties undue hardship. Therefore, unless Michigan's six-year statute of limitations for fraud undermines federal policy, the district court should have applied it and not Michigan's borrowing statute. Accordingly, I would reverse the district court's grant of summary judgment as to the federal securities fraud claim and, furthermore, would direct the district court to reinstate the pendent state claims.