**BULLETIN DISPLAYS, LLC**

v.

**REGENCY OUTDOOR ADVERTISING, INC.**

No. SACV 05–1083 SJC (ANx).

United States District Court, C.D. California.

Sept. 6, 2007.

Holly O. Whatley, Laurence Jackson, Paul M. Kakuske, Robert Antonio Madison, Christa and Jackson, Los Angeles, CA, for Plaintiff.

David P. Crochetiere, Jeffrey A. Tidus, Baute & Tidus, Los Angeles, CA, Donald E. Leonhardt, Michael L. Tidus, Tymothy S. MacLeod, Jackson Demarco Tidus and Peckenpaugh, Irvine, CA, Maryela Martinez, Santa Ana, CA, for Defendant.

## PROCEEDINGS: (IN CHAMBERS) ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [filed 7/2/07]

CORMAC J. CARNEY, District Judge.

Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* FED. R. CIV. PRO. 78; Local Rule 7–15. Accordingly, the hearing set for September 10, 2007 at 1:30 p.m. is hereby vacated and off calendar.

Plaintiff Bulletin Displays, LLC ("Bulletin") asserted claims against Regency Outdoor Advertising, Inc., ("Regency") for (1) violation of the federal Racketeer–Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961–68; (2) violation of the Clayton Act, 15 U.S.C. § 15; (3) violation of the Cartwright Act, Cal. Bus. & Prof.Code § 16720; (4) intentional interference with prospective economic advantage; (5) negligent interference with prospective economic advantage; and (6) violation of California's Unfair Competition Law, Business & Professions Code Section 17200 et seq. (Complaint, ¶¶ 53–85.)

Regency brings a motion for summary judgment on all of Bulletin's claims on grounds that (1) Bulletin's claims are barred by the applicable statutes of limitations; (2) Bulletin cannot prove the requisite proximate cause or damages necessary for its claims; (3) Bulletin's allegations of wrongful conduct on the part of Regency are not sufficient, as a matter of law, to state the claims asserted by Bulletin.

Bulletin now agrees to dismiss the two-year claims brought under state law, leaving only the RICO, Cartwright, Unfair Competition under California Business & Professions Code § 17200, and Clayton Act claims. (Opposition, p. 1.)

For the following reasons, Regency's motion is DENIED.

## STANDARD APPLIED ON SUMMARY JUDGMENT

Summary judgment is proper if the evidence before the court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue *is* "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating that there are no genuine material issues, and that it is entitled to judgment as a matter of law. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Once this burden has been met, the party resisting the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## STATUTE OF LIMITATIONS DEFENSE

The statute of limitations for civil RICO claims, Clayton Act claims, and Cartwright Act claims is four years. *See Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001); *Agency Holding Corp. v. Malley–Duff Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The U.S. Supreme Court based its choice of a uniform four year statute of limitations period for civil RICO claims on a Clayton Act analogy, indicating that courts may analyze a statute of limitations defense under both acts in a similar fashion. *Rotella v. Wood*, 528 U.S. 549, 553, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). The elements of a civil RICO claim include: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as "predicate acts") (5) causing injury to the plaintiff's "business or property." 18 U.S.C. §§ 1964(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "Pattern" is also a defined term requiring "at least two acts of racketeering activity . . ., the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Rotella*, 528 U.S. at 552, 120 S.Ct. 1075 (citing 18 U.S.C. § 1961(5)).

In the past, there was a split of authority among circuit courts regarding which accrual rule to apply in determining if a RICO claim was time-barred. In *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), the Supreme Court rejected the "last predicate act rule," under which the period began to run as soon as the plaintiff knew or should have known of the injury and a pattern of racketeering activity, but began to run anew upon each predicate act forming part of the same pattern. In *Rotella*, the Supreme Court also rejected me "injury and pattern discovery rule," which provided that a plaintiff must "discover, or be in a position to discover, the existence of a pattern of racketeering activity in addition to the existence . . . of the injury" before the limitations period is triggered. *Caproni v. Prudential Securities, Inc.*, 15 F.3d 614, 619–20 (6th Cir.1994) (footnote omitted). Instead, the Supreme Court held that the proper accrual rule to be applied in civil RICO suits is the "some form of the injury discovery rule," starting the clock when a plaintiff knew or should have known of his injury.[1] *Rotella*, 528 U.S. at 555, 120 S.Ct. 1075. The Court clarified that "in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Id.*[2]

---

1. The Supreme Court announced a similar accrual rule under the Clayton Act, providing "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Here, therefore, the Court will analyze the statute of limitations issue for all of Bulletin's four-year claims together.

2. Noting that it was not deciding which version of the injury discovery rule was appropriate, the Court left open the possibility that circuits might settle upon different versions. For example, Justice Scalia had previously espoused an "injury occurrence" rule, under

The Ninth Circuit has consistently endorsed the injury discovery rule, and reaffirmed its commitment to the rule in *Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir.1996), stating "we reaffirm this Circuit's rule that a civil RICO cause of action arises when the plaintiff knows or should know that she has been injured." The "injury" itself is the commission of the predicate acts in connection with the conduct of an enterprise. *Id.* at 511. A plaintiff's cause of action may accrue before she has discovered that all of the elements of the RICO claim exist, as long as in fact all such elements are present *Id.* at 512.

Here, Bulletin filed all of its claims against Regency on November 4, 2005. In order to win summary judgment on the four-year claims, therefore, Regency must show that there is no genuine issue that the statute of limitations clock began ticking prior to November 4, 2001. The basis of Bulletin's complaint is that Regency bribed Paul Richards, the former mayor of Lynwood, to induce the City of Lynwood ("City") to allow Regency to build new billboards and to prevent the City from allowing Bulletin to build its own billboards. (Stephens Depo., 721:9–724:4; Stevens Decl., ¶¶ 6–7.)[3] Bulletin argues that the latest of the injuries that forms the basis for its RICO, Clayton Act, and Cartwright Act claims did not accrue until November 6, 2001, when the City approved contracts with Regency providing that Regency would be able to rent and operate various billboard sites throughout the City. (Kudler Decl., ¶ 30.) Bulletin had been competing for these same sites, and thus the agreement between the City and Regency damaged the leases and CalTrans permits held by Bulletin. (Kudler Decl.,

¶ 31.) Bulletin alleges that the purpose of this agreement was not truly to allow Regency to operate billboards, but rather to harm Bulletin, as Regency could not have operated any billboards without the Cal-Trans permits that were held exclusively by Bulletin at that time. (*Id.*)

Regency, on the other hand, characterizes Bulletin's injury as "Regency's involvement," stating "Bulletin knew of the key facts underlying its claims, of Regency's alleged involvement, and that it was likely to surfer injury as early as December 2000." (Motion for Summary Judgment, p. 13.) Regency argues that Bulletin knew of Regency's involvement as early as January or February, 2001 when Mark Kudler contacted George Manyak at Eller Media/Clear Channel and told Manyak that he believed Regency was trying to "blow up" Bulletin's deal with the City. (Manyak DecL, ¶ 4.)

The Court finds that Mr. Kudler's conversation with Mr. Manyak does not establish that Mr. Kudler had knowledge of the injury that underlies Bulletin's claims. Mr. Kudler's mere suspicion that Regency was trying to undermine Bulletin's deal with the City would not have led him to reasonably believe that he had a cause of action under RICO, because Regency had not yet succeeded in contracting with the City. Bulletin still had reason to believe it could succeed in establishing a deal with the City, meaning its Caltrans permits still constituted valuable property. Therefore, Regency's alleged racketeering activity had not yet "caused injury to the plaintiff's business or property" as required by 18 U.S.C. §§ 1964(c). While a

---

which discovery would be irrelevant. *Id.* at 555, n. 2, 120 S.Ct. 1075.

**3.** Paul Richards was indicated by a federal grand jury for alleged corruption and fraud in connection with the City on October 7, 2004.

On November 1, 2005, a jury convicted Mr. Richards of 35 counts of fraud, extortion, and money laundering. (Request for Judicial Notice in Support of Plaintiffs Opposition to Motion for Summary Judgment, Exh. 2–5.)

plaintiff need not be aware of all of the elements of a RICO claim in order for the limitations period to start running, a plaintiff must know that the defendant has injured his property, and Kudler's concerns about Regency's bad intentions do not equate to an actual injury for purposes of a statute of limitations analysis.

■ The Supreme Court has held that when antitrust damages are "speculative" or "unprovable" at the time of a defendant's unlawful act, to follow the normal accrual rule (starting the limitations period at the point the act first causes injury) would leave the plaintiff without relief. *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).[4] In such a case, a claim for the injuries that had been speculative *would* accrue when those injuries occurred, even if the act that caused them had taken place more than four years earlier. *Id.* at 339–340, 91 S.Ct. 795. Here, Mr. Kudler could not have proven any damages at the time of his conversation with Manyak, as Regency had not yet entered a deal with the City and Bulletin had reason to believe its Caltrans permits were still valid. Under *Zenith,* therefore, his claim would not accrue until his damages were actually incurred, at the point Regency contracted with the City.

As evidence of Kudler's knowledge of injury, Regency also points to a letter dated August 7, 2001 that Mr. Kudler wrote to a District Attorney Investigator named Jack Counterman. In the letter, Mr. Kudler asks Mr. Counterman if Ken Spiker's recent conduct qualified as extortion, stating that "[Spiker] threatened that

if [Kudler] did not do the deal with him and pay him, that [Spiker] and Regency would work a deal with Richards to build on public land and sue me. Regency has enough political and financial resources and is more litigious than probably any other company you have met ... Thus the elements of a benefit to Spiker and a threat against me occurred and is actually being implemented" (Crochetiere Decl., Exh. W.) Just like the conversation with Mr. Manyak, this letter is evidence of Kudler's concerns about Regency's conduct, but it is not evidence of a concrete loss that would trigger the limitations period. Other federal courts have also pointed to a concrete financial loss as evidence of the accrual of an injury under RICO. For example, in *Grimmett,* the court defined the plaintiff's injury as "the loss of her interest in [plaintiffs husband's] medical practice" when the husband filed for bankruptcy. 75 F.3d at 511. In *Klehr,* a case where plaintiff dairy farmers brought a RICO claim against a farm equipment corporation for falsely representing that a silo for storing feed would prevent the feed from getting moldy, the Supreme Court noted that the injuries were "the harm to the farm," including the fact that the feed became moldy, the cows at the bad feed, and milk production and profits went down. *Klehr,* 521 U.S. at 184, 117 S.Ct. 1984.

Taking into account the description of an "injury" in RICO cases such as *Grimmett* and *Klehr,* the Court finds that Mr. Kudler's awareness that Mr. Spiker was trying to extort Bulletin does not establish that Bulletin had yet suffered a loss that would trigger the limitations period under

4. The Court's exact language is: "in antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted." *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

RICO. Mr. Spiker's threats, if genuine, may have undermined the value of the Caltrans permits held by Bulletin, but this conversation did not cause a financial loss in the manner suffered by Bulletin in November, 2001, when the City awarded bulletin board contracts to Regency. Additionally, Bulletin had no way of verifying the credibility of Mr. Spiker's statements. Mr. Kudler asserts that he did not know if Mr. Spiker was acting on behalf of Regency at the time Mr. Kudler made the threat (Kudler Decl., ¶ 17.) Mr. Kudler asserts that he had several conversations with Mr. Spiker in December, 2000, and January, 2001, at which point Mr. Kudler asked Mr. Spiker if he had a contract with Regency, and that Mr. Spiker responded each time that he did not have any such contract with Regency. (*Id.*, ¶ 15.) [5]

Third, Regency argues that Bulletin's lawsuit against the City, Richards, and others, filed on 10/3/01, provides evidence that Bulletin had actual knowledge of its injury by this date. Regency points to the fact that Bulletin's allegations in the suit against the City are nearly identical to the allegations it now asserts against Regency. The Court is not convinced that the fact that Bulletin sued different parties for the same claims it now asserts against Regency establishes that it knew or should have known of the injury inflicted by Regency on 10/3/01. Mr. Kudler asserts under penalty of perjury that at the time of the suit, he did not know if Mr. Spiker had been acting on behalf of Regency when Mr. Spiker attempted to extort Bulletin. (Kudler Decl., ¶ 27.) Additionally, Mr. Kudler did not know that Regency had had paid any bribes to the City or to Paul Richards by 10/3/01. (*Id.*) Finally, Regency had not yet entered into contracts with the City at the time of the suit, and thus Bulletin Regency had not yet caused the injury that gave rise to Bulletin's RICO claim against Regency.

■ Even if Bulletin did know prior to November, 2001 that its injury had accrued under the four-year statutes, the Court finds that there is a genuine issue of material fact a to whether Regency fraudulently concealed its pattern of racketeering activity. A court may toll the statute of limitations under the doctrine of fraudulent concealment if "the plaintiff both pleads and proves that the defendant actively misled her, and that she had neither actual nor constructive knowledge of the facts constituting his cause of action despite her due diligence." *Grimmett,* 75 F.3d at 514 (citing *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1415 (9th Cir.1987)). Here, Bulletin pled that Regency used fictitious payees on checks to conceal bribes and a fictitious "exclusive negotiating contract" to further conceal payment of fees. (Complaint, ¶¶ 45–47.) Bulletin also alleged that Regency assured that there would be no public hearings or competitive bidding on the contracts that would appraise Bulletin of the scheme to bribe City officials to get contracts (*Id.*). Bulletin appears to have acted with reasonable diligence by filing multiple lawsuits against the City to seek release of public records and by filing the same claims it now asserts against Regency.

In response to these allegations of fraudulent concealment, Regency argues

---

**5.** Regency points out that Mr. Kudler's declaration describes a conversation with Mr. Spiker that was not included in the allegations in the Complaint. The Court agrees that this may make the evidence less compelling than it would be had it been included in the Complaint, but also notes that the additional statement does not contradict the allegations within the complaint. Looking at the evidence in the light most favorable to the non-moving party, the Court finds that the declaration is sufficient to raise a genuine issue of material fact regarding if Mr. Kudler knew that Regency was working with Mr. Spiker at the time Mr. Spiker allegedly threatened Mr. Kudler.

that "Bulletin's admitted actual notice defeats a claim of fraudulent concealment." (Opposition, pp. 16–17.) As the Court finds that Bulletin did not have actual notice of its injury, and Regency offers no evidence contradicting Bulletin's allegations of fraudulent concealment, there is a genuine issue of fact regarding this issue.

Accordingly, the Court finds that Bulletin's injuries under the RICO, Clayton, and Cartwright Acts did not accrue until November 6, 2001, and that Bulletin timely filed those suits.

### PROXIMATE CAUSE

To prevail, on a RICO claim, the last element that a plaintiff must establish is that the defendant caused injury to plaintiffs business or property. *Joseph Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). This element includes two related components: first, a civil RICO plaintiff must show that his injury was proximately caused by the prohibited conduct; and second, that he has suffered a concrete loss. *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th Cir.2001).

Here, Bulletin has alleged that it suffered an injury when Regency repeatedly bribed the City in order to secure billboard contracts for Regency and to ensure that Bulletin would be granted no such contracts.[6] Bulletin argues that Regency locked Bulletin out of the bidding process by acting in conjunction with AGS, Mr. Spiker, and Paul Richards. In November, 2000 and June 2001, the City and AGS signed a contract providing that AGS would receive 20% of any payments made to the City by any billboard advertising company. (Kudler Decl., ¶ 18.) Ostensibly, AGS was to seek out possible bidders, but in tact AGS looked at no potential leases beyond Regency. This collusion allowed the City and AGS to avoid following normal public bidding processes, ensuring that Regency would be the only entity awarded the contracts to lease and operate various billboard sites around the City on November 6, 2001.

Bulletin alleges that Regency entered the contract with the City not just to compete for Billboard sites but to harm Bulletin's business. As Bulletin held the exclusive CalTrans permits at the time Regency was awarded the contract, Regency could not actually utilize the sites provided to it under the City contract unless and until the law requiring CalTrans permits was changed. Therefore, the purpose of the November 6 agreements was not primarily to obtain new sites for Regency but to prevent the City from granting these sites to Bulletin. Bulletin further alleges that if Regency and the City had succeeded in rezoning sites owned by Caltrans so that Regency could lease them without the Caltrans permits, these billboards would have obstructed vision of the sites already leased by Bulletin.

■ The Court finds that these assertions raise a genuine issue of material fact as to whether Bulletin's alleged conduct in bribing the City, colluding to keep Bulletin out of the bidding process, and contracting

---

**6.** Bulletin alleges that Regency bribed former Mayor Richards in August, 2001, by paying "consulting fees" of $50,000 to KSA, which were then passed on to Richards. (Complaint, ¶ 14.) Bulletin further alleges that Drake Kennedy of Regency struck a deal to pay the city a million dollars and arranged to pay 2 million to Mayor Richards' sister so that the City would allow Regency to build billboards in an area in which no billboards were permitted under state law, and to prevent Bulletin from obtaining a City contract (Stephens Depo., 721:9–724:4.) Regency argues that it made no such bribes, but only made a single $10,000 campaign contribution to Paul Richards in September 2001. (Motion for Summary Judgment, p. 1.) Thus, there is a genuine issue regarding the scope and nature of the harm caused by Regency.

to take over sites that would obstruct the view of Bulletin's billboards caused injury to Bulletin's business or property. Specifically, the alleged injury is the failure to be awarded a contract with the City and the loss of all value of the Caltrans permits because Regency had been awarded billboard sites that would obstruct the view of any Bulletin billboards.

In its motion for summary judgment, Regency does not attempt to establish that there is no genuine issue that Regency did not bribe the City or collude with AGS and others to ensure that there was no public bidding process for billboard sites. Instead, Regency argues that Bulletin's long history of failed permit applications before and after Regency's involvement show that it could not have obtained City permits in 2001, when Regency was awarded the contracts. (Motion for Summary Judgment, p. 16.) The Court is not convinced by this argument In 2005, after Paul Richards and other City officials were convicted or pled guilty to fraud, extortion, and money laundering, the City approved a proposed agreement Bulletin had submitted to the City, authorizing Bulletin to build billboards along the 105 freeway in accordance with its Caltrans permits. The fact that Bulletin did win City approval of its agreement after the fraud was exposed and a new City Council was sworn in raises a genuine issue regarding whether Bulletin would have been awarded the contracts much earlier, but for the alleged pattern of racketeering activity engaged in by Regency and others.

Regency also points to other factors that may have contributed to Bulletin's failure to achieve a City contract as evidence of a lack of causation. While other factors such as the City's wide discretion in issuing permits may have contributed to the delay, this does not conclusively establish that there is no genuine issue regarding probable cause. Bulletin's disputed allegations that Regency engaged in a pattern of racketeering activity raise a genuine issue regarding whether Regency's conduct was a substantial factor in the chain of causation.[7] Other federal courts have supported

7. Regency also relies on the case *Joseph Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) to argue that Bulletin has failed to establish probable cause. In *Anza*, the Ideal Steel Supply Corp. alleged that National had not paid New York sales tax, which allowed National to unfairly undercut Ideal's prices and further committed mail fraud and wire fraud when National submitted false tax returns to the New York State Department of Taxation and Finance. The Supreme Court held that Ideal Steel Supply had failed to establish the requisite probable cause for a RICO claim because the cause of Ideal's harms was the fact that National had offered lower prices, which was entirely separate from the alleged RICO violation, which was the act of defrauding the State. 126 S.Ct at 1997. The Court noted that National could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud. *Id.* The Court finds that *Anza* is inapposite as in that case, the fraud on the state of New York (a pattern of mail and wire fraud) and the act of National lowering its prices were factually and logically distinct. National was able to offer lower prices as a result of its fraud, but the fraud was not the same conduct as the act of offering lower prices. In the instant case, on the other hand, Bulletin is alleging that all of the bad acts carried out by Regency were part of a common scheme in which the City participated. Bulletin is alleging that Regency's bribes of the City and its collusion with AGS constituted a pattern of racketeering activity which prevented Bulletin from competing for contracts with the City. Bulletin is alleging that Regency's achievement of a contract with the City in November, 2001, was part and parcel of the same objective of wrongful preventing Bulletin from competing for billboard sites. Thus, there is no factual or logical separation here between the injury inflicted on Bulletin as a result of to me November 2001 agreement between Regency and the City and the alleged fraudulent activity carried out by Regency, including bribery and collusion with

the notion that when a defendant's pattern of racketeering activity shuts a plaintiff out of a bidding process, the competitor that was shortchanged may establish proximate cause. In *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 929–931 (7th Cir.2007), the court held that bidders who were shortchanged in their allocation of bids compared to the contractually agreed allocation due to the defendant's violation of the allocation rules could prove proximate cause. The court found that the defendant's act of arranging for related firms to bid so that the defendant could obtain an extra portion of profitable liens directly injured the plaintiffs because plaintiffs had a reduced chance of winning any given auction. *Id.* at 931.

Here, Bulletin allegations are similar to those of the plaintiffs in *Phoenix Bond*—that Bulletin was shut out of any competition for contracts with the City to build and operate billboard sites because of Regency's bribery of Mayor Richards and its collusion with other entities such as AGS. Bulletin clearly had a reduced, if not nil, chance of receiving a contract if indeed Regency had purchased the ability to exclude all other bidders from the process. Accordingly, the Court finds that Bulletin has established a genuine issue regarding proximate cause.

**WHETHER BULLETIN'S RICO CLAIM FAILS AS A MATTER OF LAW**

Regency also argues that Bulletin's RICO claim Ms as a matter of law because it cannot demonstrate that it suffered a concrete financial loss, show a pattern of racketeering, show a RICO enterprise, or show mail/wire fraud under 18 USC §§ 1341 and 1346.

■ The Court finds that the alleged loss of the opportunity to compete in the bidding process for a contract with City due to Regency's alleged racketeering activity does provide Bulletin with standing to prove damages under RICO. In *Phoenix Bond*, discussed *supra*, the court held that the loss of a valuable chance at winning a bid on profitable liens constituted an injury that conferred standing, stating "[e]xtra bids reduce plaintiffs' chance of winning any given auction, and loss of a (valuable) chance is real injury." *Phoenix Bond*, 477 F.3d at 930. The Ninth Circuit held that in order to prove standing under RICO with respect to damages, a plaintiff must show "a legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1170–71 (9th Cir.2002). Here, the fact that Bulletin was allegedly shut out of the bidding process shows that Bulletin lost a valuable chance at winning a contract for billboard sites. The alleged loss of the value of the CalTrans permits as a result of Regency's November, 2001 contract with the City provides sufficient evidence to establish that Bulletin had a legal entitlement to business relations that was hampered by the alleged collusion of Regency. Accordingly, Bulletin has demonstrated that a genuine issue exists regarding damages.

■■ The Court also finds that there is a genuine issue as to whether Regency engaged in a pattern of racketeering activity. In analyzing the pattern requirement, a court must examine the relatedness and continuity of the racketeering activities, meaning there must be "continuity plus relationship." *Sedima, S.P.R.L v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Bulletin has alleged that from November 2000 to Janu-

---

AGS to avoid a public bidding process. Moreover, *Anza* dealt primarily with the question of who was the proper plaintiff between the state of New York and Ideal; there is no parallel question here as the City of Lynwood was complicit in the fraud.

ary 2001, Regency and the alleged enterprise participants violated 18 U.S.C. § 1962(c) by engaging in predicate acts, such as Hobbs Act violations. (Kudler Decl., ¶ 12–16.) Bulletin asserts that this enterprise continues to the present because Regency continues to threaten using the November 2001 contracts as a potential liability for the City and Bulletin, and four billboard parcels along the 105 freeway are still open to development (LJ Decl., pp. 400–461; Exh. 96.) Thus, Bulletin has provided evidence that the predicate acts are "continuing" because its allegations describe conduct whose nature "projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

Bulletin has also provided evidence that the predicate acts are related because they have "similar or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893. Bulletin describes a series of events, beginning with Mr. Spiker's attempted extortion and continuing through Regency's success in achieving an exclusive deal with the City through bribery, that are all interrelated. Bulletin alleges that a common thread ties all of events together—Mayor Richards was looking to receive bribes for contracts and Regency was willing to pay those bribes in exchange for gaining exclusive control over the desirable billboard sites, at the expense of Bulletin's business and property interests. While Regency argues that the only scheme that took place was the one-time campaign donation to Paul Richards, Regency has not refuted Bulletins' allegations of other racketeering activity. Thus, the Court finds that there is a genuine issue regarding "a pattern of racketeering activity."

Additionally, Bulletin has established a genuine issue regarding the existence of a RICO "enterprise," defined within the statute as "including any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Bulletin has described the enterprise as including the City of Lynwood, AGS, Paul Richards, Regency, Ken Spiker & Associates, Brian and Drake Kennedy, and others. (Complaint, ¶ 55.) Regency has failed to offer any evidence establishing that there is no genuine issue that this group of individuals and the facts alleged within the Complaint do not constitute an "enterprise" under the statute.

■ Finally, the Court finds that there is a genuine issue of material fact regarding if Regency committed mail/wire fraud under 18 U.S.C. §§ 1341, 1346, which are the alleged predicate acts in furtherance of the racketeering scheme. Regency argues that the mail/wire fraud cannot be shown because mail fraud is defined in § 1341 as "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Since Regency's contract with the City did not result in Regency gaining money or property, the argument continued, Regency cannot be said to have engaged in fraud "for obtaining money or property." The Court disagrees. First, it is a genuine issue whether Regency's exclusive control over city permits and billboard sites could constitute "property," as Regency claimed they obtained leases worth $7–12 million (L.J. Decl., pp. 207–208; Exh. 48.) Second, whether Regency actually received money is immaterial: "The statute does not make the guilt or innocence of one who devises such a scheme

dependent upon its actual success." *Byron v. U.S.*, 273 F. 769, 772 (9th Cir.1921).

## WHETHER BULLETIN'S CARTWRIGHT ACT CLAIM FAILS AS A MATTER OF LAW

█ Regency argues that Bulletin's claim brought under the Cartwright Act fails as a matter of law because the conduct of the City of Lynwood is beyond the reach of the Cartwright Act. The Cartwright Act provides that "every trust is unlawful, against public policy and void" and defines the term "trust" as including any "combination of capital, skill or acts by two or more persons ... [t]o create or carry out restrictions in trade or commerce." Bus. & Prof.Code §§ 16726, 16720(a). Under *Blank v. Kirwan*, 39 Cal.3d 311, 323, 216 Cal.Rptr. 718, 703 P.2d 58 (1985), however, the actions of political subdivisions of the state, and the effects of such actions, are beyond the scope of the Cartwright Act. Regency argues that because the City of Lynwood's actions in approving the Regency Agreements and railing to approve Bulletin's agreements are the legal cause of Bulletin's injuries, this government conduct is beyond the scope of the Cartwright Act. As discussed in relation to the RICO claim, *supra*, there is a genuine issue of material fact regarding whether Regency's conduct proximately caused Bulletin's injuries. While the City's actions may have contributed to the harm, that fact does not mean that Regency's alleged bribery and collusion is not a substantial factor in the chain of causation.

## WHETHER BULLETIN'S CLAYTON ACT CLAIM FAILS AS A MATTER OF LAW

█ Section 4 of the Clayton Act, 15 U.S.C. § 15(a), grants a right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." The injured party may sue to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." The plain language of the statute indicates that a plaintiff needs to prove only two things to prevail on a section 15(a) claim: (1) that he was injured in his business or property; and (2) that the injury was the result of an antitrust violation. *Bhan v. NME Hospitals, Inc.*, 669 F.Supp. 998, 1011 (D.Cal.1987). The Ninth Circuit has also required that a plaintiff show that she is a proper party to bring an antitrust action against a defendant, in order to have standing under the Act. *See Lucas v. Bechtel Corp.*, 800 F.2d 839, 843 & n. 6 (9th Cir.1986). In deciding if a plaintiff is a proper party, the Supreme Court has identified four factors that courts should consider: (1) whether the plaintiff's alleged injury *is* the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; and (4) keeping the scope of complex antitrust trials within judicially manageable limits. *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538–545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

Here, Regency argues that Bulletin's Clayton Act claim fails because Bulletin has no property interest on which to base it. Regency notes that Bulletin only held the CalTrans permits at the time of Regency's alleged wrongdoing, and did not possess permits issued by the City. Since both types of permits are required to place an advertising display, Bulletin had no property interest upon which to base its Clayton Act claim, the argument continues. While not explicitly stated, Regency appears to be arguing that Bulletin is not a proper party because its injury is not the type the antitrust laws were intended to forestall, under factor (1) of *Associated General.* In analyzing that first factor of whether a plaintiff has suffered an anti-

trust injury, it must be shown that the injured party "participated in the same market as the alleged malefactors, either as a competitor or a consumer," *Lucas,* 800 F.2d at 844. There is no dispute that Bulletin and Regency were competing billboard advertising businesses, both trying to reach a deal with the City for contracts related to billboard leases.

The second issue under the first factor is whether the plaintiff has suffered injury in his business or property. *See* 15 U.S.C. § 15(a). The term "business" refers to "that which occupies the time, attention, and labor of [persons] for the purpose of … pecuniary reward." *Fine v. Barry and Enright Productions,* 731 F.2d 1394, 1397 (9th Cir.1984). The word " 'property' comprehends anything of material value owned or possessed," including money. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 338, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The property need not be related to a business, and the business need not be related to property. *Bhan v. NME Hospitals, Inc.,* 669 F.Supp. 998 (D.Cal.1987) (citing *Reiter,* 442 U.S. at 339, 99 S.Ct. 2326).

Bulletin Displays, LLC is clearly a business which functions for pecuniary reward. Additionally, the loss of the value of the CalTrans permits due to Regency's contract with the City, in conjunction with the loss of any chance of entering a contract with the City due to Regency's alleged bribery and collusion, qualifies as "[a] thing of material value owned or possessed." Accordingly, the Court finds that Bulletin's Cartwright Act claim does not fail as a matter of law.

For all of the foregoing reasons, Regency's motion for summary judgment is DENIED.